A97A1611. CONSTRUCTION LENDER, INC. et al. v. SUTTER et al.

(491 SE2d 853)

RUFFIN, Judge.

The Construction Lender, Inc. ("TCL") and its president, Joe Ray, appeal from a $111,727.21 jury verdict and judgment in favor of Robert and Sandra Sutter, who borrowed money from TCL to finance the construction of their Hall County home. The jury's verdict was based on the Sutters' negligence claims, in which they alleged TCL and Ray had improperly disbursed $47,500 to the builder, Joe Mustin, who then abandoned the job and left the house uncompleted. We find the evidence supports the jury's finding on one theory of negligence, but we reverse the judgment and remand for a new trial because the Sutters cannot sustain a second negligence theory and failed to prove that certain damages were proximately caused by any action of TCL or Ray.

We review the evidence, as we must, construing it strongly in favor of the jury's verdict. See *Southeastern Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 162 (1) (473 SE2d 256) (1996). Viewed in this light, the evidence shows that in April 1994, the Sutters and builder Joe Mustin agreed in writing that Mustin would construct the Sutters' home for a total contract price of $235,000. That contract specified the Sutters would give Mustin a ten percent advance, and Mustin would receive additional payments based on the "Lender's Draw schedule."

The Sutters then entered a loan agreement with TCL to finance the construction and to pay off the purchase price for the underlying land. That agreement specified TCL would make "advances" up to the "total principal amount" of the note, provided that, among other things, "[a]t the time of each advance, [TCL] is fully satisfied with the timeliness, progress, and quality of development and/or construction and, in the sole opinion of [TCL], the estimated cost of development and/or construction in accordance with the plans and specifications does not exceed the balance of the loan to be advanced." The contract further specified, however, that "[TCL] has had no control over, will have no control over, has not supervised, and will not supervise the construction of improvements on the property. [TCL] has not, does not, and will not make any representations, warranties, guarantees or promises concerning the construction, workmanship, materials, or design employed in, to be used in, or constituting the improvements on the property. [TCL's] relationship to the construction . . . is solely that of a mortgage lender, and all periodic inspections and any appraisals made by [TCL] are for the sole purpose of protecting [TCL's] security interest in the real estate and determining that progress has been made for the disbursement of construction

loan funds as work has been completed." At the bottom of the loan agreement, the Sutters signed a clause directing TCL to "make all advances under the foregoing agreement directly to the contractor" and authorizing Mustin "to apply for and receive all advances under the foregoing agreement for the purpose of paying all bills for labor and material employed in the construction. . . ."

At the closing, the Sutters learned that the ten percent advance to Mustin ($23,500) could not come from loan funds. A TCL employee told the Sutters that if they paid that advance, the $23,500 would be reimbursed to them from loan funds once the house was complete. Therefore, so long as no "change orders" were made, the Sutters alleged, TCL should have disbursed to Mustin a total of $211,500 in exchange for Mustin's completion of the house. Mr. Sutter testified no such change orders were made.

After construction began, the Sutters had problems with Mustin's work, including his incorrect placement of a driveway. In September, the Sutters asked Ray that he and TCL not make any further disbursements to Mustin without first obtaining their approval. Ray complied, and before allowing Mustin the next three draws, he called one of the Sutters and obtained authorization to make these advances. In December, however, Mustin requested an additional draw in excess of $60,000. Ray inspected the construction, decided the work completed warranted an advance of $47,500, and on December 15, 1994, disbursed those funds to Mustin without first contacting the Sutters. This unauthorized advance brought the total amount paid by TCL to Mustin to $211,564, or $64 in excess of what TCL should have paid the builder assuming no increases were made in the $235,000 fixed contract price. On December 19, 1994, Mustin abandoned the job and soon thereafter declared bankruptcy.

The Sutters presented evidence of their damages, including the amounts disbursed without authority and in excess of the contract price. They also sought the $50,000 cost of completing the house and other damages that resulted from the delays in completion caused when Mustin abandoned the job. Because the house was not complete, the Sutters were required to pay continuing interest on the construction loan and had to refinance the loan to pay the additional completion costs. They introduced evidence showing approximately $42,000 in additional unpaid materialmen's liens that Mustin's subcontractors had placed on the property. In addition to those amounts, the Sutters sought recovery for rent they paid from December 1994 through July 1995, moving expenses, damages resulting from deterioration to the house as it sat vacant and uncompleted for many months, and the cost of an insurance policy they maintained on the house from December 1994 until its completion.

At the close of evidence, but before the case was submitted to the

jury, the Sutters dropped all their contract-based claims and proceeded only on two tort theories. First, they asserted that TCL and Ray had a tort duty to ensure that payments made on the loan were timely and for work actually done. Second, they argued that Ray and TCL negligently failed to discharge the duty they voluntarily undertook to obtain the Sutters' approval before disbursing the final $47,500 to Mustin.

On appeal, Ray and TCL claim the trial court erred by denying their motions for directed verdict and judgment notwithstanding the verdict ("j.n.o.v."). They claim neither defendant had any *tort-based* duty to the Sutters and, if they did, no proximate causal connection existed between the violation of any duty and the damages the Sutters sought. Having construed the evidence strongly in favor of the jury's verdict, we must determine whether the Sutters produced *any evidence* to support their claims. *Southeastern Security*, supra.

1. (a) *Voluntary Undertaking*. We find the court properly allowed the jury to determine whether TCL and Ray negligently breached their duty to obtain authorization before disbursing funds. The Sutters correctly state the principle that "[w]here one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care. [Cit.]" *Stelts v. Epperson*, 201 Ga. App. 405, 407 (411 SE2d 281) (1991). The evidence supports a finding that Ray, on behalf of TCL, voluntarily undertook the duty to obtain approval from the Sutters before disbursing the $47,500 and breached that duty. An officer of a corporation who personally takes part in a tort committed by the corporation may be held personally liable. See *Cherry v. Ward*, 204 Ga. App. 833, 834 (1) (a) (420 SE2d 763) (1992).

However, we find no evidence supporting any claim that the voluntary undertaking encompassed more than simply obtaining approval prior to disbursing the funds. The contract between TCL and the Sutters clearly states that TCL took no responsibility for the quality of the work, and that all inspections and appraisals were done solely for TCL's benefit. Nothing in the testimony or correspondence indicates the Sutters made any request of Ray and TCL other than to obtain the Sutters' authorization before disbursing funds. Therefore, we find neither Ray nor TCL voluntarily assumed any duty to ensure that materialmen's liens were paid or that the work was properly completed.

(b) *Damages Resulting from Voluntary Undertaking*. The Sutters were entitled to recover from Ray and TCL the amounts disbursed without authority, so long as they proved these amounts would not otherwise have been paid to Mustin. See *Stelts,* supra. The evidence before us supports such a finding. But the Sutters also sought damages resulting from Mustin's failure to complete the house. Ray and

TCL, the Sutters argue, could reasonably foresee that this unauthorized payment would cause Mustin to abandon the job and would result in delays, additional expenses to pay off materialmen's liens and to complete the house, and additional personal expense for the Sutters. We disagree.

We reject the Sutters' argument that Ray's and TCL's alleged negligent disbursement caused Mustin to abandon the job. Such an argument amounts to pure speculation, especially when considering that Mustin never testified at trial and no evidence showed *why* he failed to fulfill his contractual obligations. Even though testimony showed lenders often withhold final payment to ensure that builders finish the project, nothing in the record shows the failure to withhold that payment caused Mustin to quit. In determining whether the evidence demanded a directed verdict, this Court must construe all reasonable inferences in favor of the jury's findings. *Southeastern Security*, supra. However, "[a]n inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. [Cit.] The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. [Cit.]" (Punctuation omitted.) *Niles v. Bd. of Regents*, 222 Ga. App. 59, 61 (2) (473 SE2d 173) (1996). The trial court should have directed a verdict as to any damages other than the actual amounts paid out without authorization and any interest the Sutters were required to pay on the unauthorized advance. See also OCGA § 51-12-9 (damages which are not the legal and natural consequence of an act are not recoverable).

Moreover, regardless of whether TCL "overpaid" Mustin, the builder had an independent contractual duty to complete the work in a timely manner for the fixed price of $235,000 agreed between Mustin and the Sutters. Therefore, Mustin's abandonment of the construction project was an intervening act which, by itself, was sufficient to cause these additional damages. "It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which *was not foreseeable by defendant, was not triggered by defendant's act*, and which was sufficient of itself to cause the injury. [Cit.]" (Emphasis supplied.) *Union Carbide Corp. v. Holton*, 136 Ga. App. 726, 729 (1) (222 SE2d 105) (1975). "To hold that an intervening act was not reasonably foreseeable at the time of the defendant's negligent conduct is to say that the defendant's negligence was not the proximate

cause of the plaintiff's injury. [Cit.] Although what amounts to proximate cause is undeniably a jury question, it will be determined by the court as a matter of law in plain and undisputed cases. [Cit.]" *McAuley v. Wills*, 251 Ga. 3, 7 (5) (303 SE2d 258) (1983).

We find no evidence supports the Sutters' argument that TCL and Ray could foresee that its negligent overpayment would cause Mustin to quit the job. Although the Sutters had problems with Mustin's work, these reports of problems *did not make it foreseeable that Mustin would not complete the job if he were paid more than he was due* at any certain stage of the project. In fact, Ray testified he had trusted Mustin based on his knowledge of Mustin's other construction projects, and over the prior months he and the Sutters had continued to work together despite their conflicts. Furthermore, although the Sutters made many complaints about Mustin's work in September when they requested Ray seek approval before making payments, they did approve three subsequent draws Mustin requested. The fact that lenders often hold builders' feet to the fire by withholding final payment until completion shows such a practice to be good policy for a business; however, the fact that lenders follow this practice does not automatically make it foreseeable that a builder who is paid in advance will not fulfill his contractual duties.

2. *Duty to Ensure Payment Is For "Work Actually Performed."* Citing cases such as *First Fed. &c. of Brunswick v. Fretthold*, 195 Ga. App. 482, 485 (394 SE2d 128) (1990), the Sutters argue that TCL and Ray had a *tort* "obligation to exercise diligence and good faith in the disbursement of construction funds to [Mustin, which] required that payment be made in a timely manner *and for work actually performed.*" (Emphasis supplied.) Id. See also *Peterson v. First Clayton Bank &c.*, 214 Ga. App. 94, 100 (1) (447 SE2d 63) (1994). TCL and Ray contend this language does not create any *tort* duty from a lender to a borrower, and we agree.

"It is well settled that misfeasance in the performance of a contractual duty may give rise to a tort action. But in such cases the injury to the plaintiff has been an independent injury over and above the mere disappointment of plaintiff's hope to receive the contracted-for benefit." (Citations and punctuation omitted.) *Bowdish v. Johns Creek Assocs.*, 200 Ga. App. 93, 94 (3) (406 SE2d 502) (1991). Mere breach of the contract's terms is insufficient to create a tort cause of action; the defendant must also breach an *independent* duty created by statute or common law. *Mauldin v. Sheffer*, 113 Ga. App. 874, 880 (150 SE2d 150) (1966).

We find the "duty" referred to in *Fretthold* and *Peterson* to be a contractual one: it is the duty that arises from the lender's obligation of good faith and fair dealing, which is implied in every contract. See OCGA § 13-4-20; *Toncee, Inc. v. Thomas*, 219 Ga. App. 539, 543 (4)

(466 SE2d 27) (1995). The Sutters have not cited, nor have we found, any independent statutory or common-law requirement addressing how and when builders should be paid loan funds on a construction contract. The contract between the Sutters and TCL spelled out in detail how these loan funds would be advanced. To the extent TCL improperly advanced those funds, the Sutters' remedy was in *contract*, not tort. See *Hewitt v. Walker*, 226 Ga. App. 764 (487 SE2d 603) (1997).

Generally, a construction lender has no independent duty to protect the borrower-homeowner from problems associated with the builder's work, such as construction defects or the builder's failure to pay materialmen. See *DeCoudreaux v. Mutual Fed. &c. of Atlanta*, 216 Ga. App. 503 (455 SE2d 88) (1995) (construction defects); *Peterson*, supra (materialmen's liens); *Fretthold*, supra (materialmen's liens); *Harden v. Akridge*, 193 Ga. App. 736 (389 SE2d 6) (1989) (construction defects); *Butts v. Atlanta Fed. &c. Assn.*, 152 Ga. App. 40 (262 SE2d 230) (1979) (construction defects and unfinished work). Contrary to the Sutters' arguments, we do not find their situation analogous to *Jordan v. Atlanta Neighborhood Housing Svcs.*, 171 Ga. App. 467 (1) (320 SE2d 215) (1984), in which we applied an exception to this general rule. In *Jordan*, the lender had actually prepared a list of suggested renovations for the borrower, solicited bids on those renovations, monitored the construction, and assured the borrower that "the work was progressing satisfactorily." Id. at 468. Under those circumstances, we found the lender's activity had gone "beyond that of the usual and ordinary construction money lender," making it potentially liable for its negligence in performing those additional activities. Id. at 469. Here, other than the voluntarily-assumed duty discussed in Division 1, TCL undertook no duties beyond that outlined in its contract with the Sutters. That contract specifies that all appraisals and inspections are done solely for TCL's benefit, disclaims any liability for the contractor's work, and describes TCL's relationship to the construction as "solely that of a mortgage lender[.]" Thus, the "exception" outlined in *Jordan* does not apply here.

3. Having concluded that this case proceeded to the jury on an improper theory of tort liability, and having concluded that the trial court erred in failing to grant a directed verdict on a portion of the damages, we reverse the trial court's judgment. Because the jury's verdict does not specify which "duty of care" TCL and Ray violated, we remand this case for a new trial, consistent with this opinion, on issues of liability and damages. See *Strickland v. Howard*, 214 Ga. App. 307, 310 (2) (447 SE2d 637) (1994) (general verdict returned on improper theory of liability must be reversed).

*Judgment reversed. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED SEPTEMBER 8, 1997.

*Stewart, Melvin & Frost, Frank Armstrong III*, for appellants.
*Carey, Jarrard & Walker, Mary R. Carden*, for appellees.