A99A0426. BIBB DISTRIBUTING COMPANY et al. v. STEWART et al.

(519 SE2d 455)

Judge Harold R. Banke.

Winburn Stewart, Sr. ("Stewart"), and his wife Mary Stewart, as trustee of an irrevocable life insurance trust, brought this tort and

contract action against Bibb Distributing Company and Winburn Stewart, Jr. (known as "Brother"). In its verdict, the jury determined the contractual rights and obligations of the parties and awarded the Stewarts tort damages, both actual and punitive, as well as attorney fees and litigation expenses. Bibb and Brother appeal.

Stewart founded Bibb Distributing Company in 1956, became its sole owner, and caused the company to prosper. Brother, who is Stewart's oldest son, later became employed by Bibb. In 1979, Stewart gave Brother all of the company's common stock, while retaining majority voting control.

In 1988, Stewart agreed to cede complete ownership and control of the company to Brother in consideration of Bibb's payment of $4,600,000 to Stewart over a ten-year period and its provision of a $6,868,782 death benefit to Stewart's three other children through purchase of an insurance policy on Stewart's life. The parties to this suit effectuated these transactions through a series of agreements entered into in 1988 (the "1988 agreements"). As a result of an investigation conducted by Bibb's CPA Taylor, an insurance policy on Stewart's life was obtained from Executive Life Insurance Company through payment of a $2,500,000 premium. Stewart established the life insurance trust with his wife as trustee to serve as owner of the policy. His other children were the beneficiaries.

The $6,868,782 death benefit payable to Stewart's three other children was the face amount of the policy. The policy also contained a "Return of Premium Benefit Rider" in the amount of $2,500,000 to be used to return to Bibb its premium payment upon Stewart's death. Under two of the 1988 agreements — a "split dollar insurance agreement" and "collateral assignment" agreement — the trustee was made the owner of the policy, Bibb agreed to pay the $2,500,000 premium, and the policy was assigned to Bibb as security for its premium payment. Importantly, these agreements also provided that the $2,500,000 premium payment would be returned to Bibb upon the death of Stewart prior to disbursement of the remaining funds to the trust beneficiaries.

After the Executive Life policy was acquired, Taylor forged the trustee's name to a change-of-address form so that correspondence concerning the policy would be sent to him. He did this because Executive Life had paid a commission of over $900,000 on the sale of the policy; and unbeknownst to Stewart, Brother, or Wallace, Taylor's brother-in-law was employed as the local insurance agent, received $400,000 in after-tax commissions, and provided Taylor with a $200,000 kickback. Taylor did not want his brother-in-law's involvement to become known.

When the Executive Life policy was acquired, Stewart, his attorney Wallace, and Brother were under the impression that the total

death benefit was being obtained through Bibb's payment of a lump-sum premium. Insofar as Stewart was concerned, this was vital as he did not want the availability of the death benefit to his other children in any way dependent on the solvency of Bibb under Brother's control. But neither Stewart nor Wallace read the policy and were thus unaware of a fact known by Taylor, to wit: the insurer was authorized to require payment of additional premiums if interest rates declined.

In 1990, that is precisely what happened. After Taylor advised Brother that Bibb was entitled to be reimbursed for all premium payments under the collateral assignment agreement, Brother instructed Bibb's chief financial officer to pay the additional premiums pursuant to whatever instructions Taylor gave.

Executive Life was later declared insolvent and placed in conservatorship. Under a rehabilitation plan approved in 1993, the Executive Life policy was restructured so that the $2,500,000 return of premium rider was deleted and replaced with a return of accumulation account ("RAA") providing a $456,739 death benefit, thereby resulting in a loss of approximately $2,000,000 in insurance coverage. Aurora National Life Assurance Company assumed the restructured policy ("Aurora I"). To replace the lost coverage until it could be reinstated by Aurora, Bibb paid for a $2,000,000 policy on Stewart's life issued by Manulife.

In 1994, the trust was presented with the decision of whether to opt-in to Aurora I, or to opt-out in exchange for a payment in the approximate amount of $600,000 to the trust. The power to decide belonged to the trustee, but she agreed to leave the decision to Bibb with the understanding that it would take sole responsibility for maintenance of the existing insurance coverage. Bibb decided to opt-in, based at least in part on Taylor's advice to Brother that this would provide the best chance for recovery of Bibb's premium payments.

Aurora later informed Brother through Taylor and others that it would issue an additional $2,141,000 of permanent life insurance coverage on the life of Stewart to restore the death benefit that had been lost. After Aurora indicated that it would place ownership of the additional death benefit in whomever Bibb designated, Brother and Taylor secretly arranged to have the $2,141,000 death benefit converted into a separate policy on Stewart's life with Brother named as sole owner and beneficiary. Brother accomplished this conversion by forging Stewart's name to the insurance application. Through efforts of both Brother and Taylor, Brother's ownership of the new policy ("Aurora II") was kept secret. For his part, Taylor instructed the insurance agent that "under no circumstances" should Stewart "ever get any documentation on this."

As a result of issuance of Aurora II, the $456,739 RAA was deleted from Aurora I. After Aurora II was issued, Bibb allowed the

Manulife policy to lapse. Contrary to the parties' agreements, all of this would have caused Bibb and Brother to receive approximately $4,650,000 in life insurance proceeds on Stewart's death, thereby resulting in an approximate $2,150,000 loss to the trust beneficiaries. This was described as a "sweet deal" for Brother.

The complaint charged Brother with forgery, theft, and conversion. The Stewarts stipulated that their actual damages were $236,000, the cash value of the return of premium benefit rider when Brother's forgery took place. In the liability phase of the trial, issues were presented to the jury as to whether there is an ambiguity in the 1988 agreements on the question of whether Bibb and/or Brother are required to keep the $6,868,782 policy in force by paying premiums due thereon, and whether the parties later entered into an oral agreement imposing such a requirement. The jury returned a verdict finding that Bibb and Brother are required to pay the additional premiums to keep Aurora I in effect; that Bibb is entitled to a return of premium payments on Aurora I, but not Aurora II or Manulife and not so as to reduce the net death benefit to the trust below $6,800,000; and that the Stewarts are entitled to actual damages of $236,000, punitive damages, and litigation expenses. In the punitive damages phase, the jury awarded the Stewarts $12,500,000. *Held*:

1. Bibb and Brother first contend that the trial court erred in denying their motion for directed verdict because (a) the 1988 agreements unambiguously provide that Bibb is only required to pay the initial $2,500,000 acquisition premium, and (b) there is insufficient evidence to support the claim that the parties entered into an enforceable oral modification agreement.

(a) Although the split dollar and collateral assignment agreements only make specific reference to the initial $2,500,000 premium required to acquire the Executive Life policy, they variously obligate Bibb to contribute the total premium, "the entire premium," and "all of the premium" due. The term "premium" is defined as meaning the consideration paid for an insurance policy either through a lump-sum or periodic payments. See Webster's Third New International Dictionary, p. 1789 (1981). Therefore, as used in the above agreements, the term is ambiguous and may be interpreted as referring to all premiums required to keep the policy in effect. Parol evidence, showing that it was the understanding of the parties that Bibb would be solely responsible for funding the policy, was properly considered by the jury in resolving the ambiguity. See *Thomas v. American Global Ins. Co.*, 229 Ga. App. 107, 109 (2) (a) (493 SE2d 12) (1997).

(b) Moreover, the jury was authorized to find that, in deciding to opt into Aurora I, the parties entered into a subsequent oral agreement obligating Bibb to make the additional premium payments. Consideration can be found in the trust's waiver of its arguable

right to immediate receipt of some part of the $600,000 payment if the opt-out option had been chosen, and in the delegation to Bibb of the trust's authority to decide whether to opt into the policy (a grant of authority which benefitted Bibb by allowing it to maintain its security interest in the policy).

There is no merit in Bibb's and Brother's argument that any oral agreement would have been unenforceable under the Statute of Frauds because it was not to be performed within one year from its making. OCGA § 13-5-30 (5). The agreement could have been fully performed if Stewart had died within the one year period. This possibility was sufficient to remove the agreement from operation of the Statute. *Brown v. Little*, 217 Ga. App. 632, 634 (1) (458 SE2d 669) (1995). In addition, the trustee fully performed her part of the agreement by allowing Bibb to decide whether to opt in or out, and Bibb accepted this performance by opting in and making premium payments. The Statute of Frauds does not apply "[w]here there has been performance on one side, accepted by the other in accordance with the contract." OCGA § 13-5-31 (2).

2. Bibb and Brother next contend that the trial court erred in denying their motion for directed verdict as the evidence showed that the trustee assumed the risk of loss resulting from Executive Life's insolvency, and the court erred in barring them from litigating this issue.

Evidence showing that Executive Life's insolvency resulted in the restructuring of the policy and its assumption by Aurora authorized the court in framing the issue as being whether Bibb was contractually obligated to pay additional premiums necessitated by these developments rather than whether the Stewarts had assumed a risk of loss. Bibb and Brother were not entitled to a directed verdict on the ground urged.

The court allowed Bibb and Brother to show that before the Executive Life policy was purchased, Taylor provided Stewart and Wallace with detailed information concerning Executive Life, and that the Executive Life policy was selected by the Stewarts and Wallace without involvement by Brother. The court refused to admit evidence concerning how selection was made. We find no abuse of discretion.

3. Bibb and Brother assert error in the court's denial of their motion for remittitur or new trial on grounds that the punitive damages awarded by the jury violated their federal constitutional right to due process and were also excessive under Georgia law.

" 'Punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. . . .' [Cit.]" *Southeastern Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 164 (1) (e) (473 SE2d 256)

(1996).

(a) *BMW of North America v. Gore*, 517 U. S. 559, 568 (116 SC 1589, 134 LE2d 809) (1996), nonetheless, holds that an award of punitive damages may violate due process if it is " 'grossly excessive' " in relation to a state's "legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore* sets forth three guideposts for determining federal excessiveness. One is the disparity between the harm "or potential harm" suffered by the plaintiff and the punitive damage award. 517 U. S. at 575.

The punitive damage award in this case was not excessive when viewed in relation to the harm which would have been suffered if the conversion had gone undiscovered.

(b) As a matter of state law,

> [w]e do not look to a mechanical formula to establish the relationship between general and punitive damage awards. Rather, we look to the evidence to determine whether there was support for the jury's verdict. . . . "A deterrence award is based on factors, for the most part, unrelated to the injury to any particular victim, and is limited only by the collective conscience of the jury." [Cit.] "(T)he notion that punitive damages must necessarily bear some relationship to the *actual* damages awarded by the jury has been rejected in this state. However this relationship may be considered on the issue whether the punitive damage award is excessive due to undue passion and prejudice." [Cit.]

(Emphasis in original.) *Hotle*, supra at 164, citing *Hosp. Auth. of Gwinnett County v. Jones*, 259 Ga. 759, 762 (2) (386 SE2d 120) (1989), reinstated, 261 Ga. 613 (409 SE2d 501) (1991); but see *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 123 (6) (365 SE2d 827) (1988) (plurality opinion).

Here, the record in no way demands a finding that the punitive damage award was infected by undue passion and prejudice. The trial court did not abuse its discretion in denying the motion for remittitur or new trial.

4. Bibb and Brother claim that the court erred in allowing punitive damages exceeding $250,000 without the requisite proof of specific intent to cause harm. See OCGA § 51-12-5.1; *Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 804-805 (4) (418 SE2d 604) (1992).

They base this argument on testimony by both Brother and Taylor that when Aurora II was issued, they were unaware this would result in deletion of the RAA under Aurora I. But other evidence showed that Brother was made aware of the deletion of the RAA before the acquisition of Aurora II was completed. The jury was

authorized to find from the evidence, including Brother's strenuous efforts to keep his acquisition of Aurora II secret, that he intended to deprive other parties of insurance benefits to which they were contractually entitled.

5. Bibb and Brother contend that the trial court erred in refusing to charge the jury on dual agency.

Taylor and Stewart testified that after Bibb became Brother's company, Taylor ceased acting as agent for the Stewarts, at least in regard to the matters which are the subject of this suit, although Stewart still assumed and expected him to do that which was in Stewart's best interests. Although this evidence indicates that Taylor continued to have Stewart's trust and confidence, it does not show that Stewart ever expressly or by implication authorized Taylor to act as his agent. Consequently, the requested charges were not authorized by the evidence. See OCGA § 10-6-1.

6. Bibb and Brother contend that the court erred in denying their motion for directed verdict, since Taylor was acting outside the scope of his authority when he forged the trustee's name to the change-of-address form.

Even so, there was abundant evidence showing that Taylor was involved with Brother in a tortious conspiracy to deprive the insurance beneficiaries of monies which they were due. A directed verdict was not in order.

7. Bibb and Brother next assert that denial of their motion for new trial was error because of the possibility that the general verdict was returned on an improper theory of liability. *Constr. Lender v. Sutter*, 228 Ga. App. 405, 410 (3) (491 SE2d 853) (1997).

The verdict did not specify whether actual damages were awarded under the theory of forgery, theft, and/or conversion. Bibb and Brother argue that there can be no recovery for conversion, because the RAA was the property of Bibb rather than the trustee. This argument is without merit. The trustee owned the entire policy, and Bibb had a security interest in it to collateralize its premium payment. The jury was authorized to find that deletion of the RAA through Brother's acquisition of Aurora II resulted in a conversion of the trust beneficiaries' property, given the fact that under the 1988 agreements Bibb was entitled to reimbursement for its $2,500,000 premium payment before distribution of life insurance proceeds to anyone else. Cf. *Trust Co. of Columbus v. Associated Grocers*, 152 Ga. App. 701, 702 (263 SE2d 676) (1979).

8. Bibb and Brother also contest the court's denial of (a) their motion in limine to exclude any evidence or comment concerning Brother's financial status, spending habits, or wealth, and (b) their motion to sever an issue raised by the Stewarts as to whether Bibb's corporate veil should be pierced.

(a) Although Bibb and Brother now complain of the introduction of evidence and presentation of argument concerning the fact that Brother received approximately $22,000,000 in cash benefits from Bibb between 1988 and the date of trial, their motion in limine sought to preclude the introduction of "any" evidence concerning his wealth. But to pierce the corporate veil, the Stewarts were required to show that Brother had used the corporation as a mere instrumentality for the transaction of his personal affairs. *Derbyshire v. United Builders Supplies*, 194 Ga. App. 840, 844 (2) (a) (392 SE2d 37) (1990). Certainly evidence of wealth accumulated by Brother as a result of Bibb's payment of his personal expenses was relevant to that question. Therefore, the motion in limine was properly denied.

(b) The question of whether to sever the piercing-the-corporate-veil issue addressed itself to the discretion of the trial court, and to reverse we must find a clear and manifest abuse. *Whitley v. Gwinnett County*, 221 Ga. App. 18, 19 (2) (470 SE2d 724) (1996). We do not.

9. In their final enumeration, Bibb and Brother charge the court with error in allowing the jury to award the Stewarts attorney fees and litigation expenses. The award of damages for intentional tort of conversion supported the Stewarts' claim for expenses under the "bad faith" prong of OCGA § 13-6-11. See *Rossee Oil Co. v. BellSouth Telecommunications*, 212 Ga. App. 235, 236 (441 SE2d 464) (1994). Therefore, this enumeration is without merit.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED MAY 26, 1999 —
RECONSIDERATION DENIED JUNE 24, 1999 — CERT. APPLIED FOR.

*Alston & Bird, Elizabeth A. Price, Annette Teichert, Jay D. Bennett*, for appellants.

*King & Spalding, Frank C. Jones, Robert R. Ambler, Jr., O'Neal, Brown & Sizemore, Manley F. Brown, John C. Clark*, for appellees.

