A10A2121. PARAMOUNT CONTRACTING COMPANY v. DPS INDUSTRIES, INC.

(709 SE2d 288)

BLACKWELL, Judge.

Paramount Contracting Company needed several hundred truckloads of dirt for a construction project, and DPS Industries, Inc. had dirt. DPS offered to sell its dirt to Paramount and to haul the dirt to the construction site. DPS says that Paramount accepted this offer, but Paramount denies it. Paramount ultimately bought dirt from another vendor, and DPS sued Paramount for breach of contract. The case was tried by a jury in Clayton County, which ultimately returned a verdict for DPS. After the trial court entered judgment on the verdict, Paramount brought this appeal.

The question of contract formation was a disputed issue at the trial of this case, and the parties disagreed about whether the issue is governed by Article 2 of the Uniform Commercial Code or the common law. We have observed before that it is easier, generally speaking, to form a binding contract under Article 2 than under the common law.[1] See *D. N. Garner Co. v. Ga. Palm Beach Aluminum Window Corp.*, 233 Ga. App. 252, 256 (2) (504 SE2d 70) (1998); see also *J. Lee Gregory, Inc. v. Scandinavian House*, 209 Ga. App. 285, 289 (2) (433 SE2d 687) (1993). Article 2 applies, however, only to contracts for the sale of goods, *Heart of Texas Dodge v. Star Coach*, 255 Ga. App. 801, 802 (1) (567 SE2d 61) (2002), and it does not apply to contracts for the mere provision of services or labor. *J. Lee Gregory*, 209 Ga. App. at 287 (1). When a transaction involves both the sale of a good and the provision of services or labor, whether the transaction is governed by Article 2 depends upon the "predominant purpose" of the transaction, *Olé Mexican Foods v. Hanson Staple Co.*, 285 Ga. 288, 290 (676 SE2d 169) (2009), or, put another way, " 'the thrust of the [transaction] as it would exist in the minds of reasonable parties.' " *J. Lee Gregory*, 209 Ga. App. at 288 (1) (quoting *Meyers v. Henderson Constr. Co.*, 370 A2d 547, 550 (N.J. Sup. Ct. 1977)). "When the predominant element of a contract is the

---

[1] Article 2 makes contract formation " 'easier in several ways. Parties may form a contract through conduct rather than merely through the exchange of communications constituting "offer and acceptance". . . . Further, Article [2] reduces the formalities required for contract formation.' " *J. Lee Gregory*, 209 Ga. App. at 289 (2) (quoting White & Summers, Uniform Commercial Code § 1.2).

sale of goods, the contract is viewed as a sales contract and [Article 2] applies, even though a substantial amount of service is to be rendered in installing the goods." *Heart of Texas*, 255 Ga. App. at 802 (1).

At the trial of this case, the parties disputed not only the predominant purpose of the contemplated transaction, but also the scope and nature of the transaction. DPS said that the parties contemplated only that DPS would sell and deliver dirt, and DPS urged that Article 2 applies because, according to DPS, the sale of goods—the dirt that DPS offered to furnish to Paramount—was the predominant purpose of the contemplated transaction.[2] Paramount, on the other hand, said that the parties also contemplated that DPS would perform other tasks, such as placing and compacting dirt at the construction site. And even if the parties contemplated nothing more than the sale and delivery of dirt, Paramount argued that the common law applies nonetheless because, Paramount said, the provision of a service—the hauling of the dirt—was the predominant purpose of the transaction. The trial court put the question of predominant purpose to the jury. Paramount contends on appeal that the trial court instead should have determined as a matter of law that the predominant purpose of the transaction was the provision of services and, for this reason, the common law applies.[3] We do not agree.

To determine the predominant purpose of a contemplated trans-action, a court obviously first must determine what the transaction involved, that is, what the parties contemplated each would be required to do to complete the transaction. Here, exactly what, in the contemplation of the parties, DPS would do in connection with the construction project was hotly disputed at trial, and evidence point-ing in different directions was adduced at trial. It was for the jury to weigh the conflicting evidence, resolve this disputed issue of fact, and determine exactly what the contemplated transaction involved. So long as the evidence would permit a rational jury to resolve this issue in a way that would lead to a conclusion that the sale of goods was the predominant purpose of the contemplated transaction, it was not error for the trial court to put the question of predominant purpose

---

[2] The trial court determined as a matter of law that dirt is a "good," as that term is defined in Article 2. See OCGA § 11-2-107 (1) ("A contract for the sale of timber, minerals, or the like . . . is a contract for the sale of goods within this article if they are to be severed [from the land] by the seller . . . ."). On appeal, Paramount does not challenge this determination.

[3] On appeal, Paramount enumerates the denial of its pretrial motion in limine, the denial of its motion for directed verdict, and the denial of its motion for judgment notwithstanding the verdict as error. But as Paramount admits, all three enumerations raise the same issue: whether the trial court should have let the jury decide the predominant purpose of the contemplated transaction. For the sake of simplicity, we address these enumerations together.

to the jury.[4]

Viewing the evidence in the light most favorable to DPS,[5] we conclude that the jury properly could have found that the parties contemplated a transaction of which the predominant purpose was the sale of goods. Paramount, a civil engineering firm and general contractor, was awarded a contract in early 2006 to construct runway improvements at the Atlanta Hartsfield-Jackson International Airport. When Paramount had prepared its bid for this construction project, it had asked DPS to quote a price for supplying the fill dirt that Paramount would need to complete the project. In response to this request, DPS had given Paramount a written quote for the price of furnishing and hauling fill dirt, and Paramount had incorporated this price into its bid. The written quote identifies the scope of the contemplated work as "furnish[ing] and haul[ing]/deliver[ing] borrow dirt from DPS's location to the job site," and it specifically excludes the provision of "traffic control, dust control, security and escort services" from the scope of work. The quote warrants that the dirt to be furnished to Paramount "has been approved by the [Georgia Department of Transportation] as a suitable borrow dirt." The quote invites Paramount to test the quality of the dirt. And it provides that the dirt would be delivered in "fully loaded tandem dump trucks" for a price of "$140/Truck Load."

When Paramount learned in January 2006 that it had submitted the low bid for the construction project, it contacted DPS again about the volume of dirt that it would need and the number of trucks that would be needed to haul the dirt to the Airport. At that point, DPS believed that the parties had reached a definitive agreement for DPS to sell and deliver the dirt that Paramount needed, and on January 25, DPS memorialized its understanding in a letter to Paramount. In this letter, DPS confirmed that it was "holding approximately 45,000

---

[4] The trial court instructed the jury to ascertain the predominant purpose of the contemplated transaction, to decide the question of contract formation under the provisions of Article 2 if it concluded that the predominant purpose was the sale of goods, and to decide the question of contract formation under the principles of the common law if it concluded that the predominant purpose was the provision of services. Because the jury returned a general verdict, we do not know what it concluded DPS was expected to do or whether it determined that the sale of goods was the predominant purpose of the transaction. For all we know, it framed the contemplated transaction in a way that rendered the provision of services predominant, but it nonetheless found that a contract was formed under the common law. Nevertheless, as we have said in other cases, the possibility that a general verdict was returned on an improper theory of liability requires a new trial. See, e.g., *Goldsmith v. Peterson*, 307 Ga. App. 26, 30 (2) (703 SE2d 694) (2010); *Construction Lender, Inc. v. Sutter*, 228 Ga. App. 405, 410 (3) (491 SE2d 853) (1997). We must inquire, therefore, whether the evidence authorized the jury to find some set of facts that would support a determination that the predominant purpose of the contemplated transaction was the sale of goods.

[5] Following a jury verdict, we review the evidence in the light most favorable to the verdict. *Freese II, Inc. v. Moses*, 301 Ga. App. 793, 794 (689 SE2d 98) (2009).

[cubic yards] of borrow dirt ready to be hauled in to your project once we receive [the] 10-day notice from you." Paramount did not respond in writing to this letter.

Over the next two months, DPS sent other letters to Paramount in which DPS reiterated its understanding that the parties had reached a definitive agreement. Paramount did not respond in writing to any of these letters either. Finally, after officers of DPS and Paramount met in person on April 7, 2006, Paramount sent a letter to DPS in which it disputed that the parties had reached a definitive agreement. In this letter, Paramount referred repeatedly to the purchase and sale of dirt, but the letter says nothing about the transportation of the dirt:

> [Y]ou insisted that we give commitment to you for *buying the dirt* before you will give us price [for other work]. This really was a surprise to us. . . . [W]e could not provide you with the commitment letter for the *amount of materials that we intend to purchase from you.* Also please note that we have never committed *to buy all the fill materials from you* and it was also discussed during our previous conversations. In the last meeting you were informed that *we intend to purchase some materials from you* and it may be through other subcontractors. Our decisions will be conveyed to you as soon as possible and *will let you know the amount of materials we require you to furnish.*

(Emphasis supplied.) Ultimately, Paramount decided to buy the dirt it needed from another vendor.

Viewed in this light, the evidence is consistent with a finding that the sale of dirt was the predominant purpose of the contemplated transaction. The DPS quote contains representations and warranties about the quality of the dirt. The pricing was based on the quantity of dirt furnished, not the miles driven or time spent to deliver the dirt.[6] DPS did not provide separate pricing for the sale of the dirt and its delivery. And Paramount itself, when it disputed for the first time in writing that a definitive agreement had been reached, characterized the transaction repeatedly as one for the sale and furnishing of dirt, not the hauling of dirt.

Paramount says that evidence of the actual costs that DPS would

---

[6] The quote does specify a surcharge of $55 per hour for delivery truck "downtime." But no party points us to evidence of how much downtime, if any, the parties contemplated, and there is no suggestion in any event that the parties contemplated significant downtime or that DPS would earn significant revenue as a result of downtime. The existence of this surcharge, therefore, does not demand a different characterization of the predominant purpose of the transaction.

have incurred in completing the contemplated transaction shows that its predominant purpose was the provision of hauling services, and it points to testimony about the various cost factors that DPS considered when it quoted a price to Paramount for furnishing and delivering the dirt. More specifically, Paramount relies on testimony that the costs to DPS of furnishing and hauling dirt would amount to approximately $70 or $80 per load, and that these costs would include both the expenses of operating a backhoe to load trucks and the expenses of operating the trucks. Paramount says that these cost factors all relate to hauling dirt and establish, therefore, that most of the transaction costs for DPS were related to hauling, not furnishing, the dirt.

Paramount's reliance on this evidence is misplaced for several reasons. First, although a DPS representative did testify at trial about some of the costs DPS would have incurred in the transaction, he never said that these costs were the *only* costs.[7] Second, not all the costs discussed by the DPS representative are fairly characterized as costs of hauling, rather than furnishing, dirt. For instance, the cost of operating a backhoe is not properly attributable to the hauling component of the transaction because, according to the testimony of another witness, a backhoe was needed both to separate the dirt from the land and to put it on the trucks. Under Article 2, dirt is a "good" only if it is severed from the land by the seller, see OCGA § 11-2-107 (1), so the separation of dirt from the land is a necessary component of the sale of dirt, not its transportation after sale. Third, the testimony of the DPS representative does not attribute a precise value to each of the cost factors, and for this reason, we cannot say with certainty whether most of the estimated cost of $70 or $80 per load is related to the transportation of the dirt, as opposed to the value of the dirt itself. Indeed, other than the hourly cost of a backhoe operator—which, as discussed above, properly reflects a cost of selling dirt, not hauling it—the only precise value attributed to any cost factor was the $16 or $18 per hour expense of operating a truck. There was testimony, however, that each truck could deliver a load in about one hour, so the expense of operating the truck would account, at best, for about 20 percent of the cost of each load. The limited and ambiguous testimony about the transaction costs to DPS simply does not demand a finding that the majority of the costs properly are attributable to the hauling component of the contemplated transaction.

---

[7] Whether the costs discussed in the testimony of the DPS representative were the only costs—or the only substantial costs—is not apparent from the record. Ambiguities in the testimony are for a jury to resolve, and an ambiguous record affords no basis for us to overturn a judgment entered on the verdict of a jury. See *Dumas & Assoc. v. Nalecz*, 249 Ga. App. 662, 663 (549 SE2d 730) (2001).

Finally, Paramount asks us to attribute the majority of the costs to hauling on the basis of the conventional wisdom that "dirt is cheap." We decline this invitation. Dirt might well be cheap, but we have no reason to believe that it is free and no basis for knowing just how cheap it is.[8] And the dirt that DPS offered to furnish to Paramount was not just any dirt, but dirt "approved by the [Georgia Department of Transportation] as a suitable borrow dirt." We are not prepared to speculate that the commercial value of such dirt is negligible, much less to reverse a judgment entered on a jury verdict based on such speculation. It is the burden of Paramount, as the appellant, to demonstrate reversible error, *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 740 (7) (698 SE2d 19) (2010), and it has pointed us to nothing in the record to establish that the trial court erred when it permitted the jury to assess the predominant purpose of the contemplated transaction. For these reasons, we affirm.

*Judgment affirmed. Dillard, J., concurs. Barnes, P. J., concurs specially and in the judgment only.*

BARNES, Presiding Judge, concurring specially and in the judgment only.

Although I agree that the trial court did not err in allowing the jury to decide the predominate purpose of the transaction between the parties, I do not agree with all that is said in the majority opinion. Therefore, I concur in the majority opinion, but in the judgment only.

DECIDED MARCH 16, 2011 —
RECONSIDERATION DENIED APRIL 1, 2011 — 

*James J. Dalton II, Lynn M. Swank, Christopher J. McFadden*, for appellant.
*Wayne B. Kendall, Theresa K. Read*, for appellee.

---

[8] See Attorney General of Florida, Advisory Legal Opinion No. AGO 82-18 (Mar. 19, 1982) (available at http://myfloridalegal.com/ago.nsf/Opinions/) (discussing commercial value of dirt).