[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11002

_____

WADLEY CRUSHED STONE COMPANY, LLC,
an Alabama Limited Liability Company,

Plaintiff-Counter Defendant-Appellant,

*versus*

POSITIVE STEP, INC.,
a Georgia Corporation d.b.a.
1st Quality Equipment Company,

Defendant-Counter Claimant-Appellee,

1ST QUALITY EQUIPMENT COMPANY, INC.,

Defendant-Counter Claimant,

THOMAS W. CURLEY,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 3:17-cv-00852-KFP

_____

Before NEWSOM, TJOFLAT, and HULL, Circuit Judges.

TJOFLAT, Circuit Judge:

This is a case about whether Wadley Crushed Stone Company, LLC, ("Wadley") has filed its breach of contract claim against 1st Quality Equipment Company ("1st Quality") within the applicable statute of limitations. And the applicable statute of limitations depends on whether the contract is for goods under the Uniform Commercial Code ("UCC") or for services under traditional contract law. Because we hold that the contract is for goods, and the applicable statute of limitations under the UCC has already run, we affirm the District Court's ruling that Wadley's claim was time-barred. We also affirm the District Court's grant of summary

judgment and denial of reconsideration as to 1st Quality's counter-claim for unpaid invoices.

## I.

To sum up this case, it's all fun and games until the granite plant turns out to be inefficient. Wadley is an Alabama corporation in the granite processing business. In 2009, Wadley wanted to build a granite plant in Alabama that, among other specifications, would process 500 tons of granite per hour. 1st Quality is a Georgia corporation that represents manufacturers in the sale of equipment used in the granite industry. 1st Quality sells equipment, provides customer support in connection with equipment sales, and supplies parts for some equipment from its warehouse. Based on prior business dealings between the executives of both companies, Wadley reached out to 1st Quality as it began the process of planning to build the granite plant.

1st Quality worked with both Wadley and several third parties to figure out how big the equipment would have to be to support the plant and sub-contracted with engineers, contractors, and other vendors to figure out how the plant would operate. In other words, 1st Quality was doing its due diligence to figure out what kind of equipment the new Wadley plant would need. After this investigation period, 1st Quality and Wadley entered into a contract worth $5,579,255, which allocated $4,140,255 for 27 line items of equipment, $1,384,000 for erection, installation, and electrical, and $55,000 for extra electrical. The parties expected that 1st Quality would hire Gaston Construction Company to complete the line

items for erection, installation, and electrical work for the plant (and 1st Quality would pay Gaston Construction Company accordingly).

In February 2012, Wadley asked 1st Quality if Wadley could work directly with Gaston Construction Company on the erection, installation, and electrical work.[1]  1st Quality agreed to that arrangement, and the parties signed a modified contract in May 2012, which subtracted out almost $1.5 million for the work Gaston Construction Company would do independently.[2]  In the modified contract, worth $ 4,059,224.43, there were 27 line items.  Twenty-five of the line items were for individual pieces of equipment, adding up to $3,887,274.43.  The other two line items were for installation, setup, and calibration of scales and for engineering, which combined, only added up to $171,950, less than five percent of the contract price.  Both parties understood that the engineering line item would be done by a third party, whom 1st Quality would pay.

Wadley received all the contracted-for equipment but did not pay the invoices for some of that equipment because Wadley was not satisfied with the functioning of the plant.  On its own dime, 1st Quality visited the plant to try to figure out why the

---

[1] Apparently, this is because 1st Quality was not a licensed contractor in Alabama.

[2] Any further references to the "contract" refer to this modified contract, which omitted the erection, installation, and electrical work that would now be done by Gaston Construction Company.

equipment it sold Wadley did not meet the 500 ton-per-hour re-
quirement. 1st Quality understood that the plant was supposed to
process 500 tons of granite per hour when it sold the equipment to
Wadley.

About five years after the plant was completed, Wadley sued
1st Quality in Alabama state court, arguing, among other things,
that 1st Quality breached its contract with Wadley when the gran-
ite plant did not meet the 500 ton-per-hour requirement.[3] 1st Qual-
ity removed that case to federal district court in the Middle District
of Alabama. The procedural history of this case from there is con-
voluted, and, frankly, irrelevant for our purposes until we get to
Wadley's Fourth Amended Complaint.[4] In that complaint,
Wadley alleged breach of contract as to the 500 ton-per-hour re-
quirement and as to the loadout capacity and also alleged misrep-
resentation by 1st Quality as to the specifications of the plant. 1st
Quality moved to dismiss, arguing that both the breach of contract
claims as well as the misrepresentation claim were barred by the
applicable statute of limitations. Specifically, 1st Quality argued
that the UCC's four-year statute of limitations applied to the breach

---

[3] Wadley also alleged breach of contract as to the loadout capacity of the plant
and misrepresentation as to the design of the granite plant. Wadley wanted a
plant that had a "rail ballast load out system that could load out 2,000 ton[s] of
granite per hour."

[4] The short story is that the District Court afforded Wadley multiple opportu-
nities to amend its complaint to allege facts establishing that it filed within the
applicable statute of limitations.

of contract claims because, 1st Quality said, the contract was for goods rather than services. And 1st Quality argued that a two-year statute of limitations applied to the misrepresentation claim. The District Court then dismissed the misrepresentation claim as barred by the two-year statute of limitations but allowed the breach-of-contract claims to proceed because Wadley had alleged enough facts to make it plausible that the contract was for services rather than goods, so that it was plausible the action was not time-barred.[5]

1st Quality then answered the Fourth Amended Complaint and counterclaimed against Wadley for breach of contract (and unjust enrichment) for failing to pay 1st Quality for some of the equipment at the granite plant. In the midst of both discovery and trial preparation, 1st Quality then filed two summary judgment motions, one for Wadley's claims and one for its own counterclaims against Wadley. The District Court then granted both motions for summary judgment. As to Wadley's breach of contract claims, the District Court determined that the contract was for goods under the UCC, so the applicable statute of limitations had passed before Wadley filed suit. Thus, the District Court granted summary judgment on the breach of contract claims. As to 1st Quality's counterclaim, the District Court determined Wadley had to pay the unpaid

---

[5] The District Court noted that "nothing in the contract specifically reflects the[] specific services" Wadley alleged that 1st Quality was supposed to provide.

invoices, with interest and costs, and granted summary judgment on the counterclaim as well. After the District Court denied its motion to reconsider, Wadley timely appealed the District Court's order granting summary judgment as to both claims, the District Court's denial of the motion to reconsider its grant of summary judgment as to 1st Quality's counterclaims, and the District Court's order for Wadley to pay 1st Quality based on the counterclaim, with interests and costs.

## II.

Now, we must determine whether the District Court erred in granting summary judgment for 1st Quality on both the breach of contract claims and the counterclaim for unpaid invoices and whether it erred in denying Wadley's motion for reconsideration on the grant of summary judgment as to 1st Quality's counterclaim.

We review a district court's grant of summary judgment *de novo*. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007). We grant summary judgment "when viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *see* Fed. R. Civ. P. 56(c). We review a District Court's factual findings for clear error and its legal conclusions *de novo*. *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1363 (11th Cir. 2021). Where there is no dispute over the contract terms themselves, we review *de novo* the

determination of whether the contract is for goods or services. *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1331 (11th Cir. 1998).

And, finally, we review a district court's denial of a motion for reconsideration for abuse of discretion. *Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1234 (11th Cir. 2020).

### III.

Let's start with the governing law. Federal courts sitting in diversity apply the choice of law rules for the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941). So, Alabama choice of law rules apply in this case. Alabama's choice of law rule states that the law of the state where the contract was signed governs the contract. *See Cherokee Ins. Co., Inc. v. Sanches*, 975 So. 2d 287, 292 (Ala. 2007). So, Georgia substantive law governs the contract at issue. But for procedural matters, generally Alabama applies its own law, and Alabama law considers the statute of limitations to be a procedural matter.[6] *See Battles v. Pierson Chevrolet, Inc.*, 274 So.2d 281, 285 (Ala. 1973). So, we are left with Georgia law governing the interpretation of the contract—whether it is for goods or services in this case—and Alabama law governing whether Wadley filed a

---

[6] There are exceptions to this general rule. But the parties have agreed with the District Court's holding that Alabama law governs the applicable statute of limitations, so we do not dive deeper into or disturb the District Court's analysis of the applicable statute of limitations here.

counterclaim within the applicable statute of limitations. Alabama and Georgia have both adopted the UCC, and the applicable statute of limitations under the UCC is four years. *See* Ala. Code § 7-2-725(1); O.C.G.A. § 11-2-725.

Starting with the substance of the contract, Georgia law says that when a contract is for both goods and services, the court must apply the predominant factor test to determine whether the contract is more for the sale of goods or for services. *See J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 433 S.E.2d 687, 689 (Ga. Ct. App. 1993); *S. Tank Equip. Co. v. Zartic, Inc.*, 471 S.E.2d 587, 589 (Ga. Ct. App. 1986). "When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies even though a substantial amount of service is to be rendered in installing the goods." *J. Lee Gregory*, 433 S.E.2d at 689 (internal citation and quotation marks omitted). We must determine whether the services 1st Quality provided were "incidental" to the sale of goods. *Id.* If they were, then the sale of goods was the predominant purpose, but, if the sale of goods was only incidental to the provision of services, then services predominate. *See id.*

To apply the predominant factor test, we must evaluate three aspects of the contract to determine whether goods or services are predominant: 1) the language of the contract—looking at how the parties refer to each other and the labeling of the contract; 2) the subject matter of the contract—looking to see if the contract is for a movable good; and 3) the billing of the contract—looking

to see the proportion of the contract's price dedicated to goods and services. *See Suntrust Bank v. Venable*, 791 S.E.2d 5, 7–8 (Ga. 2016); *see also BMC Indus.*, 160 F.3d at 1330 (applying the same predominant factor test to a contract governed by Florida law). If, after applying the predominant factor test, it is still unclear whether the contract is for goods or for services, Georgia law says that the UCC should "be liberally construed and applied to promote its underlying purposes and policies." *Óle Mexican Foods, Inc. v. Hanson Staple Co.*, 676 S.E.2d 169, 171 (Ga. 2009).

Under the first factor, we must look at the language of the contract. Wadley makes much of the fact that the modified contract is for a "500 TPH Portable Granite Plant." The modified contract also has a reference to the "Total Plant Selling Price." That makes it seem like the contract is for a working granite plant, a custom-built operation, which could point in the direction of the contract being for the service of designing a plant rather than just the component parts themselves. *See Heart of Tex. Dodge, Inc. v. Star Coach, LLC*, 567 S.E.2d 61, 64 (Ga. Ct. App. 2002) (explaining that the contract was for services rather than goods when the purpose of the contract was to customize a vehicle and the parts purchased to do so were only incidental to the service). The contract ends with 1st Quality's executive saying, "We thank you for giving us the opportunity to work with you on this plant." That too seems to indicate that 1st Quality was providing the service of constructing a plant. *See id.* (explaining that services were anything but incidental to customizing a vehicle).

On the flip side, the contract says that it is a "quotation," a common word used in the sale of goods. *See Paramount Contracting Co. v. DPS Indus., Inc.*, 709 S.E.2d 288, 291–92 (Ga. Ct. App. 2011) (explaining that quote for selling dirt indicated a contract for goods rather than services). And the fact that the contract refers to the "Total Plant Selling Price" can cut in 1st Quality's favor too because usually in contractual language only goods are bought and sold, in contrast to services. *See BMC Indus.*, 160 F.3d at 1330 (explaining that words like "purchase," "customer," and "seller," indicate a transaction for the sale of goods). Further, the contract specifically listed out 25 items of "equipment," which suggests a goods contract. *Id.* In *BMC*, we found that the contract's language suggested a goods transaction when it stated that it was a "purchase order 'for the fabrication and installation of automated *equipment.*'" *Id.* at 1331 (quoting parties' contract). The Court so concluded despite language in the contract that one party had hired the other to "'design, fabricate, debug/test and supervise field installation and start up of equipment to automate the operations of [BMC's production line for unfinished eyeglass lenses].'" *Id.* at 1325 (quoting parties' contract). Here, any language that would suggest a services contract is not as robust as the language in *BMC Industries*. So, the first factor does not cut decisively in either party's direction.

Turning to the second factor, we must evaluate whether the contract is for a movable good. Under Georgia law, "goods" are defined by whether they are "movable at the time of identification

12                    Opinion of the Court                    21-11002

to the contract for sale." O.C.G.A. § 11-2-105(1). In the modified contract, 25 of the 27 line items are for movable goods. Each piece of equipment is a good that was movable when the contract was signed. 1st Quality is a sales representative for *equipment*. This factor clearly favors us holding that the UCC applies to the contract.

Finally, we must evaluate how the contract was billed. *See BMC Indus.*, 160 F.3d at 1330. "[W]hen the contract price does not include the cost of services, or the charge for goods exceeds that for services, the contract is more likely to be for goods." *Id.*; *see also J. Lee Gregory*, 433 S.E.2d at 689 ("Rather it would appear that the rendition of services was the incidental factor. After all, approximately two-thirds of the cost of the transaction was allocated to [goods]."). Looking at the contract itself, we know that there were 27 line items, 25 of which were for individual pieces of equipment, totaling $3,887,274.43, over 95% of the contract price. The last two line items for the installation, setup, and calibration of the scales and engineering totaled $171,950, less than five percent of the contract price. And we know that both parties understood that the engineering included in the last line item would be done by a third party anyway, not by 1st Quality. If over 95% of the contract is for goods, then it seems pretty clear under Georgia case law, like *J. Lee Gregory*, that the contract is for goods and not services. *J. Lee Gregory*, 433 S.E.2d at 688–89. But, Wadley argues, the numbers aren't the whole story. The thrust of Wadley's response to the 95% figure is that the price for each line item of equipment in the

contract included a mark-up—meaning that 1st Quality was baking its charge for services into the cost of each item of equipment so that there is a genuine issue of material fact on the costs allocable to goods and services sufficient to defeat summary judgment.

At oral argument, 1st Quality pointed to Document 112 of the record and its exhibits to explain that 1) even accepting Wadley's argument that markups constitute service charges and assuming a 20% markup on all 25 equipment items and 2) counting the $91,000 commission payment that 1st Quality received from Gaston as a service charge, still 74% of the contract would be attributable to goods rather than services. So, 1st Quality explained, still no genuine dispute of material fact exists, even taking Wadley's figures as the right ones, because the contract is still clearly for goods based on Georgia case law. *See Zartic*, 471 S.E.2d at 588; *J. Lee Gregory*, 433 S.E.2d at 688. 1st Quality's colloquy with the Court on this issue was a surprise to Wadley, which explained that it was not aware of the figures 1st Quality was referring to. So, we asked for supplemental briefing to help us resolve the issue.

Having reviewed the supplemental briefing, we do not think it sheds meaningful light on the issue. We simply cannot conclude, as a matter of either law or fact, that the markups represent service charges. Wadley has cited no record document or case to suggest that the contracting parties agreed to the markups as disguised service charges, and it seems more logical to conclude that a sale of equipment will include a margin of profit for the seller. So, summary judgment is appropriate, because this is a contract for

goods, and the UCC's applicable four-year statute of limitations has passed.[7]

## IV.

Now, all we have left to do is decide whether the District Court properly granted summary judgment to 1st Quality and properly denied Wadley's motion for reconsideration on its counterclaim for unpaid invoices. Wadley raises three defenses on appeal that, it says, foreclose summary judgment on the issue of unpaid invoices: 1) its setoff defense; 2) its implied warranty of fitness claim; and 3) its statute of limitations defense. None are persuasive.

First, Wadley argues that it properly asserted a common-law setoff or recoupment defense below that should have foreclosed summary judgment and that the District Court's reading of

---

[7] Wadley's more global position that the contract is for services seems to be based in the outside conversations of the executives at Wadley and 1st Quality and 1st Quality's role in consulting on the plant. The problem for Wadley is that Georgia law has recognized that services will often be a part of delivering goods, and the services involved in preparing to provide goods do not transform a contract from the sale of goods to the provision of services. *See Paramount*, 709 S.E.2d at 290 ("When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and [the UCC] applies, even though a substantial amount of service is to be rendered in installing the goods." (quoting *Heart of Tex.*, 567 S.E.2d at 63)). On a separate note, we acknowledge that Wadley's counsel on appeal did not represent Wadley when Wadley originally filed its complaint. Wadley has sued its original lawyers for malpractice in not filing the breach of contract claims earlier. *Wadley Crushed Stone Co. LLC v. Rushton Stakely Johnston & Garrett*, Case No. CV-2021-900252 (Cir. Ct. of Montgomery Cnty., Ala.).

Wadley's defense as a statutory setoff defense under Ala. Code § 6-8-80 was unjustifiably narrow.  After review of Wadley's response to 1st Quality's motion for summary judgment on the unpaid invoices, we think the District Court was exactly right.  Wadley did not assert a common-law recoupment or setoff defense based on *Finish Line v. J.F. Pate & Assocs. Contractors*, 90 So. 3d 749 (Ala. Civ. App. 2012) in its response to 1st Quality, like it does on appeal. In its brief opposing summary judgment, Wadley points to Ala. Code § 6-8-80 and then says the following:

> In the event the Court finds that 1st Quality's motion for summary judgment on the unpaid invoices should be granted, while at the same time finding that WCS's claims against 1st Quality can proceed to a jury, it should decline to certify a judgment in favor of 1st Quality on its counterclaims as final under Fed. R. Civ. P. 54(b) so that the issue of set-off can be resolved at trial.

The only way to read Wadley's argument in its opposition to 1st Quality's motion for summary judgment is that Wadley wanted a setoff if it prevailed at trial.  So, if the District Court determined that 1st Quality should not prevail on its summary judgment motion on the statute of limitations issue, then, Wadley was saying, "We should be entitled to a setoff for the unpaid invoices based on whatever we get from the jury."  We agree with the District Court that Wadley did not sufficiently flesh out any other theory, such as to preserve it.  Because Wadley cannot recover on its original claim

because of the statute of limitations issue, its setoff defense is unavailing.

Next, as to the implied warranty of fitness defense, as the District Court explained, Wadley never raised implied warranty of fitness in its original pleadings. Nor did it raise an implied warranty defense in its answer to 1st Quality's counterclaim. We do not typically allow parties to raise new defenses in response to summary judgment motions that they did not already make in their answers unless there are exceptional circumstances, such as when "a pure question of law is involved" and a failure to address it would result in "a miscarriage of justice." *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1551 (11th Cir. 1991), *aff'd*, 507 U.S. 658, 113 S. Ct. 1732 (1993) ("If federal pre-emption is an affirmative defense, CSX's failure to specifically plead the defense in its answer or amended answer results in the waiver of this defense."). Had Wadley asked to amend its answer under Fed. R. Civ. P. 15(a) to include an implied warranty defense, the District Court might have allowed Wadley to remedy the problem in its answer. *See id.* It did not do so.

The reason we require parties to raise their defenses in answering a complaint or counterclaim is that it helps trial preparation as discovery is targeted toward the claims and defenses that are presented. *See Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988). And here, Wadley and 1st Quality engaged in extensive discovery before Wadley brought up this defense in its response to 1st Quality's motion for summary judgment. It would thus be unfair to 1st Quality to allow Wadley to raise that defense

now. So, there is no miscarriage of justice in us denying Wadley consideration of the implied warranty of fitness claim, and we deem it forfeited.

Finally, Wadley argues that if the UCC statute of limitations bars its claims, it should also bar 1st Quality's claim for unpaid invoices. The only problem is that Wadley forfeited that argument when it did not include it in its response to 1st Quality's motion for summary judgment on the unpaid invoices. Again, we typically do not reach arguments forfeited by the parties and only do consider them in a very limited set of circumstances. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). Wadley's failure to raise the statute of limitations defense in its response to 1st Quality's motion for summary judgment is not an "exceptional condition[]" that merits us using our discretion to consider it now. *Id.* at 1332. Wadley's argument on the statute of limitations defense is forfeited.

Therefore, the District Court properly granted summary judgment to 1st Quality on the claim for unpaid invoices and properly denied Wadley's motion for reconsideration, and the District Court's judgment is

**AFFIRMED.**