A93A0183. J. LEE GREGORY, INC. v. SCANDINAVIAN HOUSE, L.P. et al.

(433 SE2d 687)

McMURRAY, Presiding Judge.

Plaintiff J. Lee Gregory, Inc., d/b/a Perma Sash, brought a two-count complaint against Scandinavian House, L.P. ("Scandinavian House"), a limited partnership, and Immobilia International, Inc. ("Immobilia"), the general partner of Scandinavian House. In Count 1, plaintiff alleged that Scandinavian House invited it to submit a bid for the sale and installation of windows in an apartment house; that plaintiff submitted a proposal outlining the terms and conditions of the sale; that Scandinavian House accepted plaintiff's proposal; and that plaintiff and defendants entered into a contract in which plaintiff was to supply and install windows in the apartment house for $453,067. Plaintiff also alleged that defendants breached the "windows" contract and caused plaintiff to suffer monetary damages, including the cost of its performance prior to the breach ($11,556), the loss of anticipated profits ($97,345) and unabsorbed labor costs ($23,302). Plaintiff sought judgment in the amount of $135,203, plus its costs of litigation, including attorney fees. In Count 2, plaintiff sought the foreclosure of a materialman's lien on the apartment house. Defendants answered the complaint, denied liability, and counterclaimed, alleging plaintiff wrongfully filed the materialman's lien.

The following evidence was adduced via affidavit and deposition:

On February 8, 1990, plaintiff sent a proposal to Lon Meyers, Scandinavian House's Director of Management, offering to remove the old windows and to install new windows in the apartment house for a total price of $453,067. The proposal did not segregate the total price of the windows from the total price of the services to be rendered. However, approximately two-thirds of the total price reflected plaintiff's material costs; the remaining one-third of the total price reflected plaintiff's labor costs. The proposal contained, inter alia, the following provision: "VI. PAYMENT AND PERFORMANCE — Terms of payment are within ten days after receipt of materials unless otherwise stated herein. . . . Whenever Buyer shall fail or refuse, or in Seller's opinion be unable to make payments in accordance with the terms of this agreement . . . Seller may, as a condition precedent to continuing or resuming performance required of Seller . . . , require from Buyer such information, security or guarantee of performance and/or payment as in the Seller's opinion will insure timely payments under this contract. . . ." The proposal also stated: "Terms of payment are subject to approval and acceptance by Perma-Sash."

On April 2, 1990, Lon Meyers delivered a "letter of intent" to J. Lee Gregory, plaintiff's president. When he gave Gregory the letter of intent, Meyers stated that Scandinavian House had awarded the windows contract to plaintiff.

The letter of intent was signed by Jan Goransson, the president of Immobilia. It reads as follows: "Please consider this letter an indication of our intent to purchase the windows contained in your proposal dated February 8, 1990. This is your authorization to begin the measuring and the preparation of shop and installation drawings. We reserve the option to make changes until the time of installation drawing approval (approximately 2 weeks). We further reserve the option to negotiate terms and conditions of the proposal which may impact or affect the operation of the building and the installation of the windows."

Thereafter, plaintiff's employees began to measure the windows in the apartment house and to prepare shop drawings. Those tasks took approximately three weeks. When the shop drawings were finished, plaintiff delivered them to Scandinavian House.

Thereafter, on May 4, 1990, plaintiff sent a letter to Lon Meyers which reads, in part: "[Plaintiff] will provide a full payment and performance bond covering the work to be performed under the contract dated 4-9-90, made payable to the owners. . . . The cost of the bond is to be added to the contract price and to be paid for upon delivery, subject to the owner providing the contractor with one of the following options. A) An irrevocable letter of credit issued by a local Atlanta bank . . . for the full amount of the contract with payment releases in accordance with the terms of the contract. B) Deposit of

funds equal to the contract price in a local bank in the contractor's name to be released upon delivery of materials and completion of installations according to the contract. All interest earned on the escrowed funds will belong to the owners and will be released back to the owners upon payment of the contract price in full. C) Any other guarantee of payment acceptable to the contractor. Please understand when I release the order for fabrication I am obligated to pay the manufacturer for the product. . . . All I am requiring are the same assurances any prudent businessman would require. . . . If these terms are unacceptable, then we need to meet with you and determine an alternate course of action."

Responding to plaintiff's letter, Lon Meyers sent a letter to plaintiff which reads: "Please allow this letter to serve as official notification that the payment method for installation of windows in [the apartment building] is unacceptable. Therefore, the contract to install said windows will not be executed."

Thereafter, J. Lee Gregory met with Lon Meyers and Jan Goransson to resolve the dispute over the terms of payment and the payment guarantees. The parties were unable to resolve their differences and, ultimately, Scandinavian House entered into an agreement with another contractor for the replacement and installation of windows.

Following discovery, plaintiff moved for partial summary judgment upon Count 1; so did defendants. The parties agreed that two issues presented by their motions were ripe for review: (1) Whether the transaction was governed by the Uniform Commercial Code ("UCC"); and (2) whether a contract was formed between the parties. Issues regarding breach vel non and damages were not raised below. The trial court denied plaintiff's motion and granted defendants' motion, ruling that (1) the UCC did not apply to this transaction and (2) the parties did not enter into a contract. Accordingly, the trial court entered judgment against plaintiff and in favor of defendants upon Count 1 of the complaint. Plaintiff appeals, asserting the trial court erred in denying its partial summary judgment motion and in granting defendants' partial summary judgment motion. *Held*:

1. Article 2 of the UCC is expressly limited to transactions involving the sale of goods. OCGA § 11-2-102. If a contract involves only the sale of goods, the UCC applies. If, on the other hand, a contract involves only the rendition of services, the UCC does not apply.

Difficulty arises in determining whether the UCC applies to a hybrid contract, i.e., a contract involving both goods and services. When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies "even though a substantial amount of service is to be rendered in installing the goods." Anderson, Uniform Commercial Code, § 2-105:38. When, on

the other hand, the predominant element of a contract is the furnishing of services, the contract is viewed as a service contract and the UCC does not apply. *Mail Concepts v. Foote & Davies, Inc.*, 200 Ga. App. 778 (409 SE2d 567). As it is said: " ' "(A) contract for services and labor with an incidental furnishing of equipment and materials" is not a transaction involving "the sale of goods" and is not controlled by the (UCC). (Cits.)' *W. B. Anderson Feed &c. Co. v. Ga. Gas Distrib.*, 164 Ga. App. 96 (296 SE2d 395) (1982)." *OMAC, Inc. v. Southwestern Machine & Tool Works*, 189 Ga. App. 42 (374 SE2d 829). See also *Mingledorff's, Inc. v. Hicks*, 133 Ga. App. 27, 28 (209 SE2d 661) (contract for installation of heating and air conditioning systems in an apartment complex is contract for services and labor with an incidental furnishing of equipment and materials).

What was the dominant purpose of the transaction in the case sub judice? Was it the sale of goods or the rendition of services? It can hardly be said that the sale of the windows was "incidental" to the transaction. Rather it would appear that the rendition of services was the incidental factor. After all, approximately two-thirds of the cost of the transaction was allocated to the windows. Besides, the contract did not segregate the total price of the windows from the total price of the services to be rendered. See Anderson, Uniform Commercial Code, § 2-105:38, p. 582 ("fact that there is no separate charge or bill for services rendered is significant in concluding that the services were merely incidental . . ."). Thus, we think the predominant character of the transaction was the sale of goods, even though a substantial amount of service was involved in installing the goods.

The mere fact that Scandinavian House would not have purchased the windows unless plaintiff installed them is of no consequence. "When presented with two elements of a contract, each absolutely necessary if the subject matter is to be of any significant value to the purchaser, it is a futile task to attempt to determine which component is 'more necessary.' Thus, [we must look] to the predominant purpose, the thrust of the contract as it would exist in the minds of reasonable parties. There is no surer way to provide for predictable results in the face of a highly artificial classification system." *Meyers v. Henderson Constr. Co.*, 370 A2d 547, 550 (Sup. Ct. N.J. 1977).

Inasmuch as the predominant purpose of the transaction involved the sale of goods, the UCC applies. The trial court erred in ruling otherwise.

2. Having determined that the UCC applies to this hybrid transaction, we look to the UCC to determine if plaintiff and Scandinavian House entered into a contract for the sale and installation of the windows. The UCC provides, in part: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a con-

tract." OCGA § 11-2-204. It adds: "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined."

These (and other) provisions make it clear that the UCC "expands our conception of contract. It makes contracts easier to form, and it imposes a wider range of obligations than before. Contract formation is easier in several ways. Parties may form a contract through conduct rather than merely through the exchange of communications constituting 'offer and acceptance.' . . . Further, Article Two reduces the formalities required for contract formation. The statute of frauds (section 2-201) requires only a writing that 'indicate(s)' a contract was made, and 2-206 and 2-207(1) abandon the requirement that an acceptance must coincide precisely with all terms of the offer. Section 2-204(3) states: 'Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.'" White & Summers, Uniform Commercial Code, § 1-2.

Given the UCC's broad concept of contract, we have no hesitation in concluding that plaintiff and Scandinavian House entered into a contract for the sale and installation of the windows. The letter of intent manifested a clear intention to contract. It stated, in part: "consider this letter an indication of our intent to purchase the windows contained in your proposal. . . ." See generally *Kennedy v. Thruway Svc. City*, 133 Ga. App. 858, 860 (1) (212 SE2d 492). In addition, the letter authorized plaintiff to begin work on the project. The "options" reserved in the letter of intent did not expressly make the acceptance of plaintiff's offer conditional. See OCGA § 11-2-207 (1). The "options" did not demonstrate a lack of contractual intent. On the contrary, the fact that Scandinavian House deemed it necessary to reserve "options" demonstrates that it intended to contract with plaintiff.

Assuming arguendo that the letter of intent was equivocal, we would find, nevertheless, that Scandinavian House intended to contract with plaintiff. Why? Because the conduct of the parties demonstrates an intention to contract. OCGA § 11-2-204 (1); see § 11-2-207 (3). Lon Meyers gave a letter of intent to Gregory and informed him that Scandinavian House had awarded the windows contract to plaintiff. The letter of intent authorized plaintiff to take measurements and prepare shop drawings. Pursuant to the letter, plaintiff took measurements in the apartment house. That was no small undertaking and it could not have been done without the cooperation of Scandinavian House. Ultimately, plaintiff completed and delivered the shop drawings to Scandinavian House.

The conduct of the parties is inconsistent with the theory that

they only agreed to agree. On the contrary, the conduct of the parties demonstrates that they intended to enter into a contract for the sale and installation of windows. See Anderson, Uniform Commercial Code, § 2-204:37, in which the author notes that (1) "conduct may be the commencement of performance under the contract" and (2) conduct "embraces not only acts but statements indicating the belief of the parties." The mere fact that plaintiff subsequently met with defendants to resolve the guarantee of payment issue does not negate the fact that the parties entered into a contract previously.

*Judgment reversed. Beasley, P. J., and Cooper, J., concur.*

DECIDED JUNE 29, 1993.

*Griffin, Cochrane & Marshall, W. Henry Parkman, Warren N. Sams III*, for appellant.

*Cashin, Morton & Mullins, A. L. Mullins, Jr., William T. Mc-Kenzie, D. Todd Markle*, for appellees.