**ILER GROUP, INC. d/b/a Fleetistics, Plaintiff,**

v.

**DISCRETE WIRELESS, INC. d/b/a Nextraq, Defendant.**

**Civil Action No. 1:14–CV–00447–SCJ.**

United States District Court, N.D. Georgia, Atlanta Division.

Signed Feb. 24, 2015.

John Alan Sugg, Matthew Robert Thiry, Davis Matthews & Quigley, Atlanta, GA, for Plaintiff.

Katherine Marie Smallwood, Lee Alexander Peifer, Rocco E. Testani, Sutherland Asbill & Brennan, LLP, Atlanta, GA, for Defendant.

## ORDER

STEVE C. JONES, District Judge.

This matter appears before the Court on Defendant's Motion to Dismiss Plaintiff's Complaint. Doc. No. [13]. For the following reasons, Defendant's Motion is **GRANTED, in part, and DENIED, in part.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff originally filed its complaint on February 18, 2014, raising only a breach of contract claim against Defendant. Doc. No. [1]. Defendant responded by filing a motion to dismiss the complaint on March 13, 2014. Doc. No. [5]. Plaintiff, in turn, filed its First Amended Complaint (Doc. No. [9]) as a matter of right. *See* Fed. R.Civ.P. 15(a)(1). In Plaintiff's amended complaint, it raised the same breach of contract claim and also added a claim under the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"). Doc. No. [9]. Defendant then filed another motion to dismiss, this time arguing against both claims. Doc. No. [13].

On or about, July 11, 2006, Plaintiff and Defendant entered into a Dealer Agreement for the purchase of GPS tracking devices, resale of those devices, and provision of certain services related to commercial automobile fleet tracking. Doc. No. [9], p. 4.[1] The agreement's initial term lasted three years, but the term automatically renewed on a month-to-month basis until either party provided written notice to terminate it. Doc. No. [9–2], p. 11–12, 15. Pursuant to the agreement, Defendant granted Plaintiff, the "Dealer," the right to

(i) purchase Products from Discrete Wireless and market, sell and distribute such Products to Customers located in and taking delivery within the Territory; (ii) market and sell the Services on behalf of Discrete Wireless as its sales representative; (iii) install the Products only for Customers; and (iv) provide First Level Support for the Products and the Services (collectively, the "Dealer Rights").[2]

*Id.* at p. 5. The agreement defines "Product" as "(I) a Unit; and (ii) any additional hardware products and related accessories that Discrete Wireless offers from time to time." *Id.* " 'Unit' means Discrete Wireless' vehicle mounted wireless vehicle tracking device and related antennae and cables ... Discrete Wireless may designate additional devices as a 'Unit' by providing written notice to Dealer." *Id.*

After Plaintiff purchased Products from Defendant, Plaintiff would then execute a separate agreement with Customers for the resale of the Products. *Id.* at p. 6.[3] Plaintiff set the resale price and could set its own installation charges. *Id.* Defendant would not activate a Unit—the GPS tracking device—however, unless Plaintiff first obtained a Service Order from the Customer. *Id.* ("Prior to delivery or installation of a Unit to a Customer, Dealer shall obtain a Service Order (covering the Base Services for such Unit) that is fully executed by the authorized representative of Customer and Dealer shall deliver such fully executed Service Order to Discrete Wireless."). " 'Service Order' means Discrete Wireless' form of order ... for the purchase of Services directly from Discrete Wireless and the terms and conditions included on Discrete Wireless' form of order." *Id.* at p. 5.

It is important to understand the services offered to Customers under the Dealer Agreement—services provided either directly by Defendant or by Plaintiff on behalf of Defendant. "Service" is defined as "the Base Service and other services that Discrete Wireless offers Customers from time to time." *Id.* " 'Base Service' means Discrete Wireless' GPS data collection and Internet-based vehicle tracking service that transmits GPS data approximately every five (5) minutes from the Unit to Discrete Wireless' Internet-based vehicle tracking solution." *Id.* at p. 4. The agreement incorporates an attachment to define "First Level Support"—the support services Plaintiff was required to perform for Customers of Defendant. *Id.* This support includes maintaining telephone support during business hours "for Customer questions and Customer issues with Products and Services[,]" providing Customer

---

1. Plaintiff incorporated the Dealer Agreement by reference in its complaint, so the Court will cite either the amended complaint or the actual agreement throughout its Order.

2. The Court will define relevant terms under the agreement as necessary throughout this Order, but all definitions of capitalized terms may be found in the agreement itself. *Id.* at p. 4–5.

3. A "Customer" is "any person or entity that purchases one or more Products from Dealer for such person's own use and not for resale." *Id.* at p. 4.

training on the Products and Services, managing the return of Products, providing "assistance with delivery and installation of any add-on features to the Products or Services[,]" maintaining Customer account records, and providing "all service calls for each of the Products and Services during the applicable Service Order Term." *Id.* at p. 15.

Under the agreement, Defendant was required to pay Plaintiff a commission within forty-five days after the last day of each month. *Id.* at p. 7. "The Commission payment includes full consideration to Dealer for providing First Level Support for those Units and the corresponding Base Services relating to a Service Order submitted by Dealer and accepted by Discrete Wireless." *Id.* Plaintiff only received commissions for "Customer Base Service Fees received by Discrete Wireless during the Term *where the Customer Base Service Fees relate to a Service Order for at least a three (3) year term that was submitted by Dealer and accepted by Discrete Wireless.*" *Id.* (emphasis added). In other words, Plaintiff received no commission unless Plaintiff secured a Customer for Defendant for a three year term. Defendant had no obligation to pay Plaintiff a commission if a Service Order expired or was terminated, or if a Customer deactivated its Unit. *Id.*

Plaintiff alleges, and Defendant does not deny, that on or around December 15, 2008, Defendant expressly told Plaintiff that "Mobitex network based devices ... will no longer be eligible for Distributor commission after the November 2008 commission cycle." Doc. No. [9], p. 7. At that time, Plaintiff had been receiving "substantial ongoing commissions streaming from Mobitex network based devices." *Id.* at p. 8. Plaintiff claims that this unilateral modification of the agreement amounted to a breach of contract by Defendant. *Id.* Defendant made no commission payments

to Plaintiff arising out of the Mobitex network based devices beginning with the December 2008 billing cycle through when Defendant provided notice to terminate the agreement on January 7, 2014. *Id.* at p. 9.

After Defendant terminated the agreement, Plaintiff alleges Defendant "began sending emails and/or otherwise contacting [Plaintiff]'s Direct Bill Customers." *Id.* at p. 14. "Direct Bill Customers" are not billed by Defendant for Service Orders procured by Plaintiff. *Id.* at p. 11. These customers contract directly with Plaintiff for products and services, and Plaintiff, in turn, contracts with Defendant. *Id.* Plaintiff incorporated one email in its complaint to illustrate the alleged contact Defendant made with Plaintiff's Direct Bill Customers. The email was sent by Mr. David Flores, an account manager for Defendant, to Ms. Diane Reynolds, who Plaintiff claims is a Direct Bill Customer representative for the City of Palm Coast, Florida. *Id.* at p. 15. The email states,

Ms. Reynolds,

My name is David Flores with NexTraq[.] I am your new account manager. Here is my contact information. I extend to you an award winning level of account management in effort to exceed the experience you may have had with Fleetistics. If I may be of help please do not hesitate to reach out to me. Business as usual is all that's called for. Continue to use the same equipment and platform to manage your vehicles going forward. I look forward to speaking with you in the future.

Doc. No. [9–2], p. 38. Plaintiff claims this "post-termination contact" is a violation of GUDTPA because it either "passes off the goods or services provided by [Plaintiff] to the Direct Bill Customers as the goods and services of [Defendant,]" or "causes the likelihood of confusion or of misunder-

standing as to the source, sponsorship, approval, or certification of goods or services[,]" or both. Doc. No. [9], p. 14–15.

## II. LEGAL STANDARD

A complaint may be dismissed if the facts as pleaded do not state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 679–80, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (explaining "only a complaint that states a plausible claim for relief survives a motion to dismiss"); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 561–62, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (retiring the prior *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) standard which provided that in reviewing the sufficiency of a complaint, the complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In *Iqbal,* the Supreme Court reiterated that although Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

In *Twombly,* the Supreme Court emphasized a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S.Ct. 1955. Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. 1955 (internal citations and emphasis omitted).

## III. DISCUSSION

### A. *Breach of Contract Claim*

Plaintiff alleges that Defendant breached the Dealer Agreement when it unilaterally stated it would no longer pay Plaintiff commissions on Mobitex GPS Units in December 2008. Defendant denies that it breached the agreement, but it bases its motion to dismiss this claim on a statute of limitations defense. Defendant argues that this contract is governed by Georgia's Uniform Commercial Code[4] ("UCC") which contains a four year statute of limitations. *See* O.C.G.A. § 11–2–725(1) (2012). Because Defendant's alleged breach occurred, at the latest, in December 2008, Plaintiff's breach of contract claim is time barred because the complaint was filed on February 18, 2014, more than four years later. Plaintiff argues that the agreement is not for the sale of goods and thus not governed by Georgia's UCC. In Plaintiff's view, this is a services contract and was timely filed within the six year statute of limitations for simple contracts in writing. *See* O.C.G.A. 9–3–24 (2012). Alternatively, Plaintiff argues, that even if the contract is subject to a four year limitation, Defendant's failure to pay monthly commissions amounts to successive breaches, each of which begins a new statute of limitations. The Court, then, must determine whether the contract is governed by Georgia's UCC and when any alleged cause of action accrued.

#### 1. *Governing Law*

Article 2 of the Georgia UCC applies to transactions involving the sale of goods. O.C.G.A. § 11–2–102. If a contract involves only the sale of goods, the UCC governs the contract. *Heart of Tex. Dodge, Inc. v. Star Coach, LLC,* 255 Ga. App. 801, 802, 567 S.E.2d 61, 63 (2002). If a contract involves only the rendition of services, the UCC does not apply. *Id.*

---

4. The Dealer Agreement contains a Georgia choice of law provision. Doc. No. [9–2], p. 13.

"Difficulty arises in determining whether the UCC applies to a hybrid contract, i.e., a contract involving both goods and services." *J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 209 Ga.App. 285, 287, 433 S.E.2d 687, 689 (1993). "When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies 'even though a substantial amount of service is to be rendered in installing the goods.'" *Id.* (citation omitted). If furnishing services is the predominant element of the contract, the UCC does not apply. *Id.* at 288, 433 S.E.2d at 689. The predominant purpose of a contract is "the thrust of the contract as it would exist in the minds of reasonable parties." *Id.* at 288, 433 S.E.2d at 690. The Georgia Court of Appeals recognized that "[w]hen presented with two elements of a contract, each absolutely necessary if the subject matter is to be of any significant value to the purchaser, it is a futile task to attempt to determine which component is 'more necessary.'" *Id.* Therefore, to determine the predominant purpose is the surest "way to provide for predictable results in the face of a highly artificial classification system." *Id.* (internal quotations omitted).

The contract between Plaintiff and Defendant involved both the sale of goods and the rendition of services. Plaintiff, in the first instance, purchased GPS tracking devices, or "Units," from Defendant and then resold them to Customers. The first service Plaintiff provided was the actual resale of Defendant's Units. Plaintiff then provided another service by procuring Service Orders from the Customers to whom it resold the goods. Under the agreement, Plaintiff could not resell the tracking devices to a Customer unless the Customer executed a Service Order with Defendant. Once Plaintiff made the resale and secured the Service Order, it then installed the devices on behalf of Defendant. Finally, Plaintiff provided First Level Support for Customers who purchased Defendant's products from Plaintiff.

 Although Plaintiff may have provided a "substantial amount of service," the Court finds that the predominant purpose of the contract was the sale of goods.[5] Plaintiff correctly states that three of its four "Dealer Rights" relate to services. But for the purchase and resale of Defendant's products, however, all of Plaintiff's services would be worthless. Regarding installation services, Georgia courts have found that installation of the goods sold does not amount to a predominantly service-based contract. *D.N. Garner Co., Inc. v. Ga. Palm Beach Aluminum Window Corp.*, 233 Ga.App. 252, 255–56, 504 S.E.2d 70, 73–74 (1998); *S. Tank Equip. Co. v. Zartic, Inc.*, 221 Ga.App. 503, 504, 471 S.E.2d 587, 589 (1996). The First Level Support provided by Plaintiff was limited to telephone support, Customer training, managing returns of the devices, maintaining Customer account records, and providing service calls. Doc. No. [9–2], p. 15. Every service encompassed within First Level Support related directly to Defendant's products that Plaintiff purchased from Defendant and then resold to Customers.

Plaintiff dedicates a significant amount of argument to the fact that it could not sell Defendant's tracking devices without

---

**5.** The Court notes that dealer or distributor agreements are normally governed by the UCC even though such agreements are often more than simple sales contracts. *See, e.g., Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1385–86 (7th Cir.1995); *Intercorp, Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1528 (11th Cir.1989); *PCS Joint Venture, Ltd. v. Davis*, 219 Ga.App. 519, 520, 465 S.E.2d 713, 714 (1995). This generalization does not resolve the issue alone, however, because the Court must still determine the predominant purpose of this specific agreement.

first procuring a Service Order. Plaintiff claims this requirement demonstrates the service-based nature of the contract. This argument again misses the point. The Service Order details the "purchase of Services *directly from Discrete Wireless.*" Doc. No. [9–2], p. 5 (emphasis added). Not only is this service provided directly by Defendant, the service is comprised of "Discrete Wireless' GPS data collection and Internet-based vehicle tracking service that transmits GPS data ... *from the Unit* to Discrete Wireless' Internet-based vehicle tracking solution." *Id.* at p. 4 (emphasis added). Plaintiff's primary "service" is to resell the Unit it purchased from Defendant. The procurement of Service Orders for Defendant is incidental to the resale. There is no purpose to requiring a Service Order without the sale of a Unit. Moreover, without the Unit, as demonstrated in the definition of "Base Service," there would be no service to provide. In other words, if the Unit installed on the commercial automobiles did not collect GPS data and transmit that data to Defendant then "fleet tracking services" would be impossible.

Plaintiff further argues that the commission structure between the parties illustrates the predominately service-based nature of the agreement. The commission "includes full consideration to Dealer for providing First Level Support *for those Units and the corresponding Base Services* relating to a Service Order." *Id.* at p. 7 (emphasis added). "The Commission shall be limited to the Customer Base Service Fees received by Discrete Wireless during the Term where the Customer Base Service Fees relate to a Service Order for at least a three (3) year term that was submitted by Dealer and accepted by

Discrete Wireless." *Id.* " 'Customer Base Service Fee' means the monthly recurring fee *for the Base Services for each Unit* that is charged by Discrete Wireless to Customer." *Id.* at p. 4 (emphasis added). As explained, Plaintiff's procurement of a Service Order is incidental to the purchase and resale of the GPS tracking devices. First Level Support, while possibly a substantial service, is incidental to the purchase and resale of the Unit. The main service provided, Base Service, is provided directly by Defendant and tied directly to the products Plaintiff purchased and then resold. To illustrate, the Base Service itself primarily consists of the collection and transmission of data by the Unit. The agreement clearly links the commission payments to Customer Base Service Fees, which are monthly fees charged by Defendant to Customers "for the Base Services for each Unit." *Id.* By limiting the commission payments to Customer Base Service Fees, the agreement effectively limits commissions to payments by Customers for use of the Unit and the substantial data it provides. The mere fact that the commission payments include consideration for First Level Support, services that are ancillary to the resale of goods yet provided solely by Plaintiff, does not change this result. Moreover, Defendant has no obligation to pay Plaintiff a commission on expired or terminated Service orders, or if a Customer deactivates a Unit. *Id.* at p. 7. Thus, if a Customer discontinues using the GPS tracking device, the premise upon which a Service Order is founded, or deactivates the device, Plaintiff receives no further commissions. This is further evidence that the Unit, the goods purchased and resold, predominate over any services provided under the agreement.[6]

---

**6.** Plaintiff also argues that the possibility of receiving a "Service Fee" for providing First Level Support "with respect to Units and the corresponding Base Services that do not relate to a Service Order submitted by Dealer"

demonstrates that services predominate over the sale of goods. Doc. No. [20], 11–12. The Court disagrees with this argument because it is limited to one paragraph of a rather com-

To summarize, the predominant purpose of the agreement is the purchase and resale of goods, in this case, GPS tracking devices. All services provided by Plaintiff under the agreement are incidental to this primary purpose. Without the purchase and sale of a GPS tracking device, no "fleet tracking services" could be provided either by Plaintiff or Defendant. Therefore, the four year statute of limitations under Georgia's UCC applies to Plaintiff's breach of contract claim. *See* O.C.G.A. § 11–2–725.

### 2. Accrual Date

Having decided that the UCC applies to this cause of action, the Court must now determine when the cause of action accrued. Defendant mainly relies on a single case from the Eleventh Circuit Court of Appeals and argues that the cause of action accrued on the date Defendant allegedly anticipatorily repudiated paying Plaintiff commissions on Mobitex Units. *See Am. Cyanamid Co. v. Miss. Chem. Corp.*, 817 F.2d 91 (11th Cir.1987). Plaintiff responds with two lines of authority. The first line, Plaintiff argues, holds that a cause of action does not accrue until the time for performance if the non-repudiating party opts to await performance. *See Advance Tufting, Inc. v. Daneshyar*, 259 Ga.App. 415, 577 S.E.2d 90 (2003). Plaintiff alternatively argues that because general contract law supplements the UCC, a divisible contract, such as the one at bar, provides a new accrual date for each separate payment or performance as it becomes due. *See Baker v. Brannen/Goddard Co.*, 274 Ga. 745, 559 S.E.2d 450 (2002). At the very least then, Plaintiff believes the UCC statute of limitations

does not bar a claim for monthly commissions owed by Defendant for the four years preceding the date the complaint was filed.

In *American Cyanamid*, the Eleventh Circuit considered whether a seller's cause of action was barred by the UCC's statute of limitations.[7] *American Cyanamid*, 817 F.2d at 92–93. The contract ran for one year for the purchase, sale, and delivery of rocks in twelve equal monthly installments. *Id.* at 92. The contract also imposed a one year statute of limitations for any claim for breach. *Id.* During the term, the buyer made an anticipatory repudiation stating that it could only consume forty-five percent of the quantity of rocks previously budgeted. *Id.* The court found that, under New Jersey law, "a cause of action accrues and the statute of limitations begins to run upon the date when a right to institute and maintain a suit first arises." *Id.* at 93. Although § 2–610 of New Jersey's UCC allowed the non-repudiating party to wait a commercially reasonable time before filing a claim, it also permitted the aggrieved party to "resort to any remedy for the breach" immediately. *Id.* Thus, the court held that the cause of action accrued on the date of the anticipatory breach. *Id.* The seller's breach of contract claim was barred because it was filed outside of the contractually imposed statute of limitations. *Id.*

The Eleventh Circuit disposed of two additional arguments relevant to this action. First, the seller argued that because § 2–610 allowed it to wait a commercially reasonable time before filing suit, it delayed commencement of the statute of limi-

---

prehensive agreement and simply provides for only the possibility of an additional fee unrelated to the primary purpose of the purchase and resale of goods.

**7.** Plaintiff argues that *American Cyanamid* should hold no weight against Georgia cases

on point because the Eleventh Circuit, in that case, construed the laws of New Jersey. The Court disagrees with this argument, however, because the provisions of New Jersey's UCC relevant to that case are identical to the same provisions in the Georgia Code.

tations. *Id.* at 94. The Eleventh Circuit flatly rejected this argument. *Id.*

> The section does no more than give a party the option of choosing the time at which it will pursue a remedy for the breach. This in no way alters the fact that a breach has occurred and a cause of action has accrued. Indeed, the purpose of § 2–610 in giving a party the option of awaiting performance was simply to overturn the harsh common law rule that one who urged the other party to perform after repudiation forever lost his right to complain of the repudiation.

*Id.* The court stated, "[i]t is plausible to argue that, *in an installment contract,* the cause of action for breach of the contract is not unitary but that, rather, a separate cause of action arises for each defaulted portion of the installment agreement." *Id.* (emphasis added). The court rejected this argument as well. *Id.* It discussed one case where the New Jersey Supreme Court allowed a landlord to recover for defaulted monthly rental payments prior to the termination of the rental agreement. *Id.* That result was "premised upon the presence of a severability or survival covenant in the lease contract." *Id.* At least in New Jersey, "where such a clause was not present the damages arising from the breach of the lease would form the basis for only a single cause of action." *Id.* By analogy, the Eleventh Circuit believed "New Jersey courts would hold that the anticipatory breach of an installment contract creates a single unitary cause of action, at least unless the parties have mutually agreed that a severable cause of action arises for each defaulted installment." *Id.*

In *Advance Tufting,* the Georgia Court of Appeals determined when the cause of action accrues on an open commercial account governed by Georgia's UCC. *Advance Tufting,* 259 Ga.App. at 417–18, 577 S.E.2d at 92–93. The plaintiff argued, in part, that its cause of action was not time barred under a recent United States Su-

preme Court case, *Franconia Assocs. v. United States,* 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002). *Id.* at 418, 577 S.E.2d at 93. The Georgia court interpreted *Franconia* to hold that a law enacted by Congress "effected a repudiation of the right to prepay certain loan contracts which borrowers had previously negotiated to facilitate building low- and middle-income housing." *Id.* The Georgia court then quoted *Franconia,*

> the time of accrual ... depends on whether the injured party chooses to treat the ... repudiation as a present breach ... If that party elects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from the time of performance to the date of such election ... But if the injured party instead opts to await performance, the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier of *repudiation.*

*Id.* (internal quotations omitted) (emphasis in original). The Georgia court concluded that, in *Advance Tufting,* the defendant did not repudiate the contract. *Id.* at 418, 577 S.E.2d at 94.

In *Baker,* the Georgia Supreme Court expressly construed the contract at issue under the general six year statute of limitations for simple written contracts—not the four year limitations statute under the UCC. *Baker,* 274 Ga. at 748, 559 S.E.2d at 453; *see* O.C.G.A. § 9–3–24. The alleged breach in *Baker* was the defendant's failure to pay monthly commissions to plaintiff for procuring real estate tenants. *Id.* at 745, 559 S.E.2d at 451. The commissions were due during the term and during any extension or renewal of the agreement. *Id.* at 748–49, 559 S.E.2d at 453–54. The court stated "[w]hen the statute of limitations begins running on a breach of

contract claim depends on whether the agreement is entire or divisible." *Id.* at 748, 559 S.E.2d at 453 (citing *Douglas & Lomason Co. v. Hall,* 212 Ga.App. 475, 441 S.E.2d 870 (1994)). The court ruled that the agreement before it "is not entire, because the contractual consideration at issue is not a single sum certain which remained unpaid after a definite due date." *Id.* "Thus, the contract was for an indefinite total amount which was payable in installments over the uncertain period of the underlying tenancy." *Id.* at 749, 559 S.E.2d at 454. "The commissions agreement is, therefore, a divisible installment contract . . . In such an agreement, the breaches occur at successive periods . . . [and] an action will lie for each breach; but all the breaches occurring up to the commencement of the action must be included therein." *Id.* (citing O.C.G.A. § 13–6–14 (2012)) (internal quotations omitted). The court then reiterated the general rule in Georgia that "[a] statute of limitations begins to run 'on the date that suit on the claim can first be brought.'" *Id.* (quoting *Hoffman v. Ins. Co. of N.A.,* 241 Ga. 328, 329, 245 S.E.2d 287, 288 (1978)). The court held that the statute of limitations first began to run when the first breach of the commissions agreement occurred. *Id.* at 749–50, 559 S.E.2d at 454. Although the suit was filed outside of the statute of limitations, because the contract was a divisible installment contract,

> only the monthly installments due more than six years before the suit was filed are barred. Because the agreement is "strictly divisible, the statute will run separately as to each payment or per-

formance when it becomes due, either as an independent obligation or as a return for an instal[l]ment of the counter-performance."

*Id.* at 750, 454, 559 S.E.2d 450 (quoting *Piedmont Life Ins. Co. v. Bell,* 103 Ga. App. 225, 235, 119 S.E.2d 63, 72 (1961)).

■ This Court finds that the cause of action originally accrued when Defendant anticipatorily repudiated paying further commissions on the Mobitex Units on or around December 15, 2008.[8] Although the Eleventh Circuit construed New Jersey law in *American Cyanamid,* the relevant statutory provisions are identical to those in Georgia. There, the court rejected the argument that § 2–610 "amount[ed] to a legislative amendment of the general rule that a cause of action begins to run from the moment suit can be brought." *Am. Cyanamid,* 817 F.2d at 93–94. In *Baker,* the Georgia Supreme Court expressly recognized that "a statute of limitations begins to run on the date that suit on the claim can first be brought." *Baker,* 274 Ga. at 749, 559 S.E.2d at 454. Georgia code section § 11–2–610 permits the non-repudiating party to immediately "[r]esort to any remedy for breach" when the other party repudiates the contract. O.C.G.A. § 11–2–610(b). Because Plaintiff could have sued immediately for breach of contract when Defendant repudiated its obligation of future performance under the contract, the cause of action originally accrued on December 15, 2008.[9] The inquiry does not end here, however.

Plaintiff argues that the Georgia Court of Appeals' holding in *Advance Tufting*

---

8. At least for the sake of determining when the statute of limitations accrued, neither party argues that Defendant did not anticipatorily repudiate the contract. Thus, to determine the commencement of the statute of limitations, the Court also assumes Defendant repudiated its obligation to pay commissions on Mobitex Units.

9. Although the Court uses an exact date for the anticipatory repudiation even though Plaintiff claims the repudiation occurred "on or around December 15, 2008," the exact date is irrelevant given that the contract is a "divisible installment contract" under Georgia law.

permits a non-repudiating party under Georgia's UCC to await performance and thus delay the commencement of the statute of limitations until the time for performance is due. It is true that *Advance Tufting* was decided in 2003, sixteen years after *American Cyanamid,* but the Georgia court based this particular interpretation of law on a non-UCC, United States Supreme Court case. *See Franconia Assocs.,* 536 U.S. 129, 122 S.Ct. 1993 (2002). The contract at issue in *Franconia* was for loan payments on real property. *Id.* at 132–33, 122 S.Ct. 1993. The alleged anticipatory repudiation was a statutory enactment by Congress. *Id.* at 133, 122 S.Ct. 1993. The contract in *Franconia* had no connection to the UCC or a contract for the sale of goods. In fact, the Supreme Court expressly recognized this fact when it began analyzing the accrual date for the statute of limitations in that case "[u]nder applicable principles of general contract law." *Id.* at 141, 122 S.Ct. 1993 (internal quotations omitted); *see also* O.C.G.A. § 9–3–24 (stating that the six year statute of limitations for simple contracts in writing "shall not apply to actions for the breach of contracts for the sale of goods under Article 2 of Title 11"). While the general rule in Georgia and most jurisdictions is to allow a non-repudiating party to await performance and delay commencement of the statute of limitations, the Eleventh Circuit squarely rejected this theory under language identical to Georgia's UCC in deciding when a cause of action accrues when one party anticipatorily repudiates a contract governed by the

UCC. *See Am. Cyanamid,* 817 F.2d at 93–94. Thus, the general rule and the holdings of *Advance Tufting* and *Franconia* are inapplicable to the case at bar.

Georgia courts do, however, hold that where there is a divisible installment contract, the statute of limitations runs separately as to each payment or performance as it becomes due. *Baker,* 274 Ga. at 749, 559 S.E.2d at 454. Although this Court has found no UCC case that expressly follows this line of authority, the cases do not limit this particular rule of law to causes of action under general contract law.[10] These cases merely discuss "a divisible contract," which conceivably covers all forms of contracts. *See id.; Piedmont Life Ins. Co.,* 103 Ga.App. at 235, 119 S.E.2d at 71–72; *see also* O.C.G.A. § 13–6–14 (2012) ("If the contract is entire, only one action may be maintained for a breach thereof; but, if it is severable or if the breaches occur at successive periods in an entire contract, an action will lie for each breach."). Georgia's UCC also expressly states that, "[u]nless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions." O.C.G.A. § 11–1–103.

The *Baker* court defined a "divisible installment contract" as a "contract ... for an indefinite total amount which [is] payable in installments over the uncertain period of the underlying tenancy." *Baker,* 274 Ga. at 749, 559 S.E.2d at 454. In that case, the contract called for commissions on a monthly basis during the term and

---

10. The cause for such a lack of authority is possibly due to the inherent difficulty in applying the UCC to hybrid contracts for the sale of goods and rendition of services. On one hand, a strict installment contract is commonplace among transactions involving the sale of goods. Most divisible installment contracts, however, revolve around some form of commission or divisible payment over a peri-od of time owed by one party to another for the rendition of services. *See id.* (collecting cases). Because Georgia courts have never limited the application of a "divisible installment contract" to statutes of limitation under general contract law, this Court must apply the holdings of these cases with equal force to a contract governed by Georgia's UCC.

renewal of the term. *Id.* Because the cause of action originally accrued outside the statute of limitations, all causes of action outside of the relevant statute of limitations in *Baker* were time barred. *Id.* at 749–50, 454–55, 559 S.E.2d 450. On the other hand, because the agreement was a "divisible installment contract," the statute of limitations ran "separately as to each payment or performance when it [became] due." *Id.* at 750, 454, 559 S.E.2d 450. Thus, all commission payments due under the contract in *Baker* which occurred within the statute of limitations were not time barred. *Id.* at 749–50, 454–55, 559 S.E.2d 450.

The contract at issue in this action is a divisible installment contract. The contract ran for an initial three year term and then automatically renewed on a month-to-month basis until either party provided written notice to terminate. Taking Plaintiff's allegations as true for the purposes of this motion to dismiss, Defendant owed Plaintiff a monthly commission on Mobitex Units. The agreement placed no limit on the amount of Units Plaintiff may sell, which in turn placed no limits on the amount of support for those Units Plaintiff may provide. The actual commission payments, therefore, were "for an indefinite total amount." Because the monthly commissions were due forty-five days after the last day of each calendar month during the initial term or any automatic renewal of the agreement, the commissions were "payable in installments over the uncertain period" of the agreement.

Defendant recognizes that this contract is not exactly like the contract at issue in *American Cyanamid.* Defendant asks the Court to analyze the present contract as "analogous to an installment contract" under the UCC. Doc. No. [13–1], p. 15. Under the Georgia UCC, an installment contract "is one which requires or authorizes the delivery of goods in separate lots to be

separately accepted." O.C.G.A. § 11–2–612(1). This definition of an installment contract is exactly the type of contract at issue in *American Cyanamid.* But, as the Court already explained, the agreement between Plaintiff and Defendant is a hybrid contract for the sale of goods and rendition of services where the sale of goods predominates over the rendition of services. Georgia courts do not limit the successive and separate running of the statute of limitations for a divisible installment contract to general contract law. Those courts apply the same language to all contracts, focusing solely on whether the contracts are "divisible" or "entire." Thus, the Dealer Agreement at issue is a divisible installment contract under *Baker.* Although Plaintiff filed its complaint outside the UCC four year statute of limitations when the cause of action first accrued on December 15, 2008, Plaintiff's claims for Defendant's alleged breach of contract by failing to pay monthly commissions on Mobitex Units for the four years preceding the date the complaint was filed are not time barred under Georgia law.

**B. *Uniform Deceptive Trade Practices Act Claim***

Plaintiff alleges that Defendant's post-termination contact of its Direct Bill Customers violates GUDTPA. Although Plaintiff claims Defendant made multiple contacts with its Direct Bill Customers, it included as an example only one email sent by a representative of Defendant to one of Plaintiff's customers on March 3, 2014. Doc. No. [9–2], p. 38. Defendant sets forth three reasons for the Court to dismiss this cause of action. First, Defendant argues that Plaintiff lacks standing because Plaintiff does not, and cannot, allege future harm which is the only relief afforded under the GUDTPA. Second, Defendant contends that Plaintiff's conclusory allegations in its complaint fail to

state a claim for which relief may be granted. Finally, Defendant maintains that Plaintiff did not comply with Federal Rule of Civil Procedure 15(d) in raising a new cause of action in its amended complaint based on events that occurred after the complaint was originally filed.

### 1. Standing

Defendant first argues that Plaintiff lacks statutory standing to bring its GUDTPA claim because it does not allege future harm. Doc. No. [13–1], p. 20–21. The only relief available under the GUDTPA is injunctive relief. *Catrett v. Landmark Dodge, Inc.*, 253 Ga.App. 639, 644, 560 S.E.2d 101, 106 (2002); *see also* O.C.G.A. § 10–1–373(a) (2012) ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive is not required."). "To have standing to seek injunctive relief under the UDTPA, a plaintiff must show ... that [it] is likely to be damaged in the future by some deceptive trade practice of the defendant." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F.Supp.2d 1340, 1364 (N.D.Ga.2012) (internal quotations omitted). "A plaintiff who demonstrates past harm, but does not allege ongoing or future harm, has not shown that he is likely to be damaged within the meaning of section 10–1373(a)." *Silverstein v. Procter & Gamble Mfg. Co.*, No. CV 108–003, 2008 WL 4889677, at *4 (S.D.Ga. Nov. 12, 2008) (internal quotations omitted).

The Court finds that Plaintiff maintains statutory standing and sufficiently pleaded future harm to withstand a motion to dismiss. Plaintiff alleged that "[s]ubsequent to the termination of the Agreement by Discrete Wireless, Discrete Wireless began sending emails and/or otherwise contacting IGI's Direct Bill Customers."

Doc. No. [9], p. 14. Plaintiff states that such contact "passes off the goods or services ... as the goods and services" of another, and "causes a likelihood of confusion...." *Id.* Plaintiff does not merely allege past harm. Plaintiff alleges "ongoing or future" harm. *See Silverstein*, 2008 WL 4889677, at *4. Simply because Plaintiff attached an email as an example of Defendant's initiation of this future harm does not change the result. In fact, had Plaintiff not incorporated the sample email of Defendant's allegedly deceptive trade practice, Defendant's motion almost certainly would have been granted. The thrust of Plaintiff's GUDTPA claim, however, is that this one snapshot of an allegedly deceptive trade practice is ongoing and threatens to damage Plaintiff's relationships with its Direct Bill Customers. Taking Plaintiff's allegations as true, these specific Customers do not have a contractual relationship with Defendant. Doc. No. [9], p. 11. If Defendant now "passes off [its] goods and services as those of another[,]" or "causes a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services[,]" and continues to do so on an ongoing basis, as Plaintiff alleges, then Plaintiff is subject to future harm and maintains statutory standing under the GUDTPA.

### 2. Failure to State a Claim

Defendant next argues that Plaintiff's bare, conclusory allegations are insufficient under Federal Rule 12(b)(6) to state a claim for which relief may be granted. Doc. No. [13–1], p. 21–23. Defendant then attacks the email Plaintiff incorporated into its complaint and states "nothing in that email could plausibly be construed as deceptive or actionably misleading." *Id.* at p. 22–23.

Defendant is correct that the allegations contained in Plaintiff's complaint, standing alone, are somewhat bare, conclusory statements that need not be accepted by the Court when faced with a 12(b)(6) motion. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. But the email Plaintiff incorporated by reference, in addition to Plaintiff's allegations, supply the necessary factual detail to "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* Plaintiff raises two grounds for its GUDTPA claim. First, it claims that through Defendant's post-termination contact of Plaintiff's Direct Bill Customers, it "passes off goods and services as those of another." *See* O.C.G.A. § 10–1–372(a)(1). Second, through the same contact, Plaintiff claims Defendant "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services." *See* O.C.G.A. § 10–1–372(a)(2). Again, Plaintiff alleges its Direct Bill Customers do not have a contractual relationship with Defendant, and, at least for the contract entered into between Plaintiff and the City of Palm Coast, Florida, it may not be transferred or assigned. Doc. No. [9], p. 11, 15.

The email Plaintiff incorporated into its complaint is from Mr. David Flores, an account manager for Defendant, to Ms. Diane Reynolds, a representative of one of Plaintiff's Direct Bill Customers. Doc. Nos. [9], p. 15; [92], p. 38. Mr. Flores first discloses that he is a representative of Defendant and is the Direct Bill Customer's "new account manager." Doc. No. [9–2], p. 38. He then states, "I extend to you an award winning level of account management *in effort to exceed the experience you may have had with [Plaintiff]*." *Id.* (emphasis added). He goes on, "Business as usual is all that's called for. Continue to use the same equipment and platform to manage your vehicles going forward." *Id.*

Viewed in the light most favorably to Plaintiff, the allegations in the complaint and the incorporated email state a claim for which relief may be granted. If it is true that Direct Bill Customers do not have a contractual relationship with Defendant, Defendant's representative's declaration that he is "your new account manager" plausibly "passes of goods or services as those of another" and causes a likelihood of confusion or misunderstanding "as to the source, sponsorship, approval, or certification of goods or services." That same conclusion is reiterated when Mr. Flores stated that he sought to exceed the experience the Direct Bill Customer had with Plaintiff. If it is true that the contract between Plaintiff and this Direct Bill Customer was not transferable or assignable, then, taken together, these two statements plausibly state a claim under the Georgia GUDTPA. Stating that one is definitively "your new account manager" while, in the same paragraph, competing for business against a now-rival company, could certainly cause a likelihood of confusion. Moreover, Defendant's representative goes on to state that the customer should continue business as usual and continue to use the same platform and equipment to manage its vehicles. This implies that nothing has changed. Plaintiff's allegations, however, state that Direct Bill Customers "do not have a Service Order or any other agreement with Discrete Wireless regarding the fleet tracking services provided by Discrete Wireless." Doc. No. [9], p. 11. If Direct Bill Customers have no business relationship with Defendant, aside from using the actual products Plaintiff purchased from Defendant and resold to the customer, then it is unclear to the Court why the customer would have an "account" with Defendant at all.

Without more evidence from Defendant regarding how these statements invariably

do not pass off goods and services as those of another or do not cause a likelihood of confusion or misunderstanding, the Court is unwilling to dismiss Plaintiff's GUDTPA claim at this stage of the proceedings.

### 3. Federal Rule of Civil Procedure 15(d)

■ Defendant finally argues that because Plaintiff did not comply with Federal Rule of Civil Procedure 15(d), its GUDTPA should be dismissed. Doc. No. [13–1], p. 23–24. Federal Rule 15(d) states,

On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Fed.R.Civ.P. 15(d). Defendant contends that the post-termination contact for which Plaintiff bases its GUDTPA claim occurred after the original action was filed. Doc. No. [13–1], p. 23. Thus, Rule 15(d) required Plaintiff to provide reasonable notice and move for leave to set out a new cause of action. *Id.* at p. 24.

■ Defendant is correct that Plaintiff failed to comply with Federal Rule 15(d) in "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The email demonstrating the allegedly deceptive trade practice primarily relied upon by Plaintiff is dated March 3, 2014. Doc. No. [9–2], p. 38. Plaintiff filed its original complaint on February 18, 2014. Doc. No. [1]. Plaintiff does not argue that it provided reasonable notice, and Plaintiff did not move to supplement its original pleading even though it filed its First Amended Complaint as a matter of right under Fed-

eral Rule 15(a)(1). But "[a] district court shall freely give leave to amend 'when justice so requires.'" *Nance v. Ricoh Elecs., Inc.,* 381 Fed.Appx. 919, 923 (11th Cir.2010) (quoting *Laurie v. Ala. Court of Criminal Appeals,* 256 F.3d 1266, 1274 (11th Cir.2001)). "'There must be a substantial reason to deny a motion to amend,' such as 'undue delay, bad faith, dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Id.* Given the early stages of these proceedings, the Court finds that none of these reasons are sufficient to deny leave to amend. Also, because the Court finds that Plaintiff states a claim for which relief may be granted under the GUDTPA, the Court disagrees with Defendant that supplementing the pleadings would be futile.

Because Plaintiff failed to comply with Rule 15(d), however, Plaintiff's GUDTPA claim is **DISMISSED WITHOUT PREJUDICE.** Plaintiff is **ORDERED** to provide reasonable notice to Defendant that it will seek to supplement its pleading with the GUDTPA claim and move the Court for leave to supplement the pleading within five days of this Order. The Court, having found there is no reason to deny Plaintiff's motion, will then properly grant Plaintiff's motion under Rule 15(d), and Plaintiff must then file a second amended complaint on the docket which will serve as the controlling complaint in this action.

### CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. No.[13] ) is **GRANTED, in part, and DENIED, in part.** Plaintiff is **ORDERED** to provide reasonable notice to Defendant that it will seek to supplement its complaint with the GUDTPA claim and move the Court for

leave to supplement the complaint within five days of this Order.